*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2018 UT 22**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

J.P. FURLONG COMPANY,
*Petitioner,*

*v.*

BOARD OF OIL, GAS AND MINING and the
DEPARTMENT OF NATURAL RESOURCES,
*Respondents.*

No. 20150620
Filed June 5, 2018

On Petition for Review of Administrative Agency Action

Utah Board of Oil, Gas and Mining
Docket No. 2015-013
Cause No. 139-130

Attorneys:

Anthony T. Hunter, Wichita, KS, for petitioner

Sean D. Reyes, Att'y Gen., Michael S. Johnson, Meg Osswald,
Asst. Att'ys Gen., Salt Lake City, for respondents

JUSTICE PEARCE authored the opinion of the Court
in which CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE HIMONAS, and JUSTICE PETERSEN joined.

JUSTICE PEARCE, opinion of the Court:

### INTRODUCTION

¶ 1    J.P. Furlong Company (Furlong) owns a mineral lease. Furlong challenges the Board of Oil, Gas, and Mining's (Board) decision to impose a joint operating agreement (JOA)[1] on its

---

[1] We use "JOA" to refer to the joint operating agreement the operator—EP Energy E&P Company, L.P. (EPE)—proposed and the
(continued . . .)

relationship with the party operating a drilling unit that includes Furlong's lease. Furlong primarily complains that the Board accepted, without change, the JOA the operator proposed. Furlong also assails the Board's refusal to make any of the changes to the JOA that Furlong wanted.

¶ 2    The JOA is materially the same agreement that governs other interests in the project and is based on a widely accepted form agreement. Furlong nevertheless challenges the Board's decision, arguing that there was not substantial evidence to support it, and that the Board erroneously applied the law to arrive at its conclusion that the JOA was just and reasonable. We see no merit in either of these contentions and affirm.

## BACKGROUND

¶ 3    Utah law allows the Board to "establish[] . . . drilling units for a pool." UTAH CODE § 40-6-6(1). A "pool" is "an underground reservoir containing a common accumulation of oil or gas or both." *Id.* § 40-6-2(19). And drilling units are "defined as an area from which the oil or gas may be efficiently and economically produced through one well located in the center of the unit." 1 SUMMERS OIL AND GAS § 5:1 (3d ed. 2017).

¶ 4    Utah also allows for voluntary and compulsory pooling. Pooling "bring[s] together . . . separately owned interests for the common development and operation of a drilling unit." UTAH CODE § 40-6-2(20). Voluntary pooling occurs when "[t]wo or more owners within a drilling unit . . . bring together their interests for the development and operation of the drilling unit." *Id.* § 40-6-6.5(1). In the absence of such a voluntary agreement, "the board may enter an order pooling all interests in the drilling unit for the development and operation of the drilling unit." *Id.* § 40-6-6.5(2)(a). This is, as the name suggests, compulsory pooling. *See* 1A SUMMERS OIL AND GAS § 6:4 (distinguishing between voluntary and compulsory pooling).

¶ 5    In the course of pooling their interests, parties often enter into a joint operating agreement. 4 SUMMERS OIL AND GAS § 48:1.

> A joint operating agreement . . . is a contract typical to the oil and gas industry whose function is to designate an operator, describe the scope of the operator's authority, provide for the allocation of costs and

---

Board ultimately adopted. We will use "joint operating agreement" to refer to joint operating agreements generally.

production among the parties to the agreement, and provide for recourse among the parties if one or more default in their obligations.

*Id.*

¶ 6    The drilling unit here is split into several tracts of land. EP Energy E&P Company, L.P. (EPE) and Furlong, among other parties, have an interest in Tract 6 of the drilling unit. Tract 6 represents 11.59 percent[2] of the drilling unit. 89.48 percent of Tract 6 is under lease to EPE. 2.08 percent of Tract 6 is under lease to Furlong and another company, KKREP, in equal proportion. Therefore, Furlong has an interest in only 1.04 percent of Tract 6, and just 0.12 percent of the drilling unit.

¶ 7    All but three working interest owners[3] voluntarily pooled their interests and signed a joint operating agreement with EPE. Furlong is one of the three holdouts.[4]

¶ 8    Furlong and EPE negotiated in hopes of agreeing to voluntarily pool their interests. EPE sent Furlong a proposed joint operating agreement which Furlong returned with suggested changes. EPE accepted one change, rejected others, and asked for explanation on the rest. Furlong explained the rationale behind its edits.

¶ 9    At that point, EPE ceased negotiations, stating that the parties had "reached an impasse as to mutually agreeable [joint operating agreement] terms." EPE also informed Furlong that it had filed a Request for Agency Action before the Board and that it would seek to force pool all of the interests in the drilling unit. EPE left open the option of further negotiation "[s]hould Furlong be willing to reconsider its position" on changes to the JOA.

---

[2] For readability, the percentages are rounded.

[3] A "[w]orking [i]nterest is an interest in [oil or gas] by virtue of a lease, operating agreement, fee title or otherwise, including a carried interest, the owner of which is primarily obligated to pay, either in cash or out of production or otherwise, a portion of the [u]nit [e]xpense . . . ." 5 SUMMERS OIL AND GAS § 67:12.

[4] The other two are Argo Energy and Dusty Sanderson, who together own 0.1 percent of the working interest in the drilling unit.

¶ 10  The Board conducted a hearing.[5] EPE asked the Board to force pool the remaining three interests—including Furlong's[6]—and to impose the JOA on the interest holders.

¶ 11  The JOA the Board adopted was "materially the same form as the [joint operating agreement] signed by the other participating working interest owners in Section 2, including Furlong's co-lessee . . . ." It is also "materially identical" to joint operating agreements EPE has used since 2011. EPE has agreed to these same terms when it is an interest holder and not an operator. In other words, the Board accepted evidence that EPE had agreed to terms like those in the JOA when it stood in Furlong's shoes.

¶ 12  An EPE employee testified that the adopted JOA was "a standard industry form supplied by the American Association of Professional Landmen [AAPL], Form 610." Furlong did not dispute that EPE used the model form to craft the JOA. Indeed, it conceded that the Board "could [look] at the AAPL" to identify terms to include in a joint operating agreement.

---

[5] EPE also asked the Board to declare Furlong a non-consenting owner and impose a risk compensation penalty of 300 percent. The Board held that Furlong was not a non-consenting owner, and therefore did not have to pay the risk compensation penalty.

That decision is not before us on appeal. But the decision had positive implications for Furlong. As we explained in *Bennion v. ANR Production Co.*,

> The [order imposing a non-consent penalty] . . . allow[s] Bennion to receive a royalty from the time of first production. Before he can receive a working interest share of production, however, the new order requires Bennion to pay his share of 100 percent of the costs of surface equipment beyond the wellhead, 100 percent of the operating costs, and 175 percent of the costs of drilling, completing, and equipping the well.

819 P.2d 343, 345 (Utah 1991). Just as in *Bennion*, Furlong was facing the possibility of having to pay more than its share of the costs to receive its share of the profits. The Board's decision freed Furlong from that fate.

[6] "The Board grant[ed] EPE and Furlong's request to force pool Furlong's interest." Both parties wanted Furlong's interest force pooled and this decision is not before us on appeal.

¶ 13 Nevertheless, Furlong argued that any joint operating agreement the Board imposed should differ from the standard form in several ways. First, Furlong did not want the JOA to be recorded and publicly available. Furlong explained that it did not "want [the JOA] out there for all the public to read."

¶ 14 Second, Furlong requested a change to a section involving "[i]nterests of the parties." Prior to the Board action, EPE had approved one of Furlong's changes to this section, but refused to add an "acknowledgment from [EPE] that it agrees and will perform the accounting for the [lease] and any burdens that may be created in the future . . . ." During the hearing, an EPE employee explained that EPE wanted each party to bear their own burdens, which is the system the model form imposes.

¶ 15 Third, Furlong proposed to amend the language "in no event shall [Operator] have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct." Furlong wanted this section to read "in no event shall [Operator] have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct *or from breach of the provisions of this agreement*." Furlong explained that it added this language because "[a]ll parties, including operators, should be held to the performance of their contractual promises." EPE argued that it would not want to "accept broader liabilities than what is industry standard reflected in the model form [joint operating agreement]." Furthermore, EPE asserted that "there are already remedies for breach of contract claims in the JOA . . . ."

¶ 16 Fourth, Furlong proposed a change to the provision: "Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of [$75,000]." That section also excepted several categories of expenses. Furlong requested that EPE strike the exceptions and add language providing that "Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of [$75,000] *without first delivering to NonOperators a supplemental [authorization for expenditure]*." Furlong explained that it "want[ed] to be protected from excess expenditures." EPE pointed to the model form, stating that "[it] is not willing to provide Furlong or any other co-owner . . . or non-operator with protections over and above what is provided in the model form for excess expenditures."

¶ 17 Fifth, Furlong argued for two changes to the "[e]xpenditures and [l]iability of [p]arties" section. Furlong requested that the Board delete the provision that allowed the "Operator . . . the right from time to time to demand and receive from one or more of the other parties payment in advance of their respective shares . . . ." EPE claimed that its company policy was to have these "cash calls" built into the operating agreements because they protect "the operator and the other non-operators in the well from a party that fails to pay or slow pays their proportionate share of expenses." EPE argued that cash call provisions were widely accepted in the industry and played an especially important role "with non-operators like Furlong who have no track record with [EPE] for paying their bills timely." Furlong responded that it has had negative experiences with cash calls because operators have taken money, but not drilled. Then, according to Furlong, the operator waits years to return the funds and when it does, it returns them without interest. Furlong also wanted another portion of the JOA deleted that involved cash calls. Both sides essentially repeated their prior cash call arguments with respect to that provision.

¶ 18 Sixth, Furlong wanted to extend the statute of limitations for certain contract claims. EPE argued that this was "excessive."

¶ 19 Seventh, Furlong argued for the addition of language restricting EPE's ability to use affiliated companies. Specifically, Furlong wanted to add language—"[n]otwithstanding provisions to the [c]ontrary"—that affiliates "may be used for goods and services as long as their rates are consistent with the average commercial rate prevailing in the area as evidenced by current bids." Furlong explained that "[it] ha[d] no issue with use of affiliates for the provision of goods and services but it want[ed] their charges to be fair which a bid process would support." EPE testified that the existing language tracked standard industry language on the topic.

¶ 20 After the hearing, the Board found "under the facts of this case, the terms of the EPE propos[ed] [JOA] are just and reasonable." The Board further explained that:

> The [AAPL] model-form-based JOA proposed by EPE is similar to other [joint operating agreements] previously adopted by this Board in prior compulsory pooling matters. The Board also notes that [joint operating agreement] terms materially the same as those proposed by EPE in this matter have been agreed upon and are presently in effect between other consenting owners within the subject drilling unit.

6

Although [joint operating agreements] substantially similar to this form of operating agreement were previously deemed just and reasonable in prior matters, the Board analyzed the JOA proposed by EPE anew for purposes of making its determination in the present case. The Board's analysis included consideration of testimony given by the parties' witnesses regarding Furlong's proposed edits and amendments to certain provisions of the JOA as proposed by EPE. While legitimate disagreement can exist about the provisions at issue, and while the parties' differing proposed terms might be reasonable under certain circumstances, on balance, the Board finds that under the facts of this case, the terms of the EPE proposal are just and reasonable and adopts them for purposes of this matter.

¶ 21 Furlong appeals.

**ISSUES AND STANDARDS OF REVIEW**

¶ 22 Furlong challenges the Board's decision to adopt EPE's proposed JOA and raises two main arguments.

¶ 23 First, Furlong argues that the Board's order is not supported by substantial evidence. Under Utah Code section 63G-4-403(4)(g), we can grant relief if "the agency action is based upon a determination of fact, made or implied by the agency, that is not supported by substantial evidence when viewed in light of the whole record before the court." As the language suggests, we "review[] the agency's determination of fact for a lack of substantial evidence." *Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 19, 308 P.3d 461. We "examin[e] the whole record to determine whether 'a reasonable mind might accept as adequate the evidence supporting the decision.'" *Oliver v. Utah Labor Comm'n*, 2017 UT 39, ¶ 13, --- P.3d --- (citation omitted).

¶ 24 Second, Furlong argues that "[t]he Board erroneously applied Utah law when it failed to 'balance the interests of competing parties . . . .'" (Citation omitted). The Board's "interpretation of [the relevant statutes] is a question of law, which we review for correctness." *Rueda v. Utah Labor Comm'n*, 2017 UT 58, ¶ 18, --- P.3d --- (citation omitted).

**ANALYSIS**

¶ 25 Furlong primarily argues that the Board's adoption of EPE's proposed JOA does not have substantial evidentiary support. To prevail on this claim, Furlong must show that he "has been substantially prejudiced" by an agency action "that is not supported by substantial evidence when viewed in light of the whole record before the court . . . ." UTAH CODE § 63G-4-403(4).

> A decision is supported by substantial evidence if there is a quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion. In conducting a substantial evidence review, we do not reweigh the evidence and independently choose which inferences we find to be the most reasonable. Instead, we defer to [an administrative agency's] findings because when reasonably conflicting views arise, it is the [agency's] province to draw inferences and resolve these conflicts.

*Provo City v. Utah Labor Comm'n*, 2015 UT 32, ¶ 8, 345 P.3d 1242 (alterations in original) (internal quotation marks omitted) (citations omitted). And here, we review the Board's conclusion that the JOA was "just and reasonable" for substantial evidence. UTAH CODE § 40-6-6.5(2)(b); *Id.* § 63G-4-403(4).[7]

¶ 26 Furlong has several grievances with the Board, but the general thrust of its arguments centers on Furlong's contention that the Board did not specifically indicate why it rejected each individual change Furlong requested. Furlong argues that this effectively hides the fact that EPE presented no evidence to the Board that would have allowed the Board to properly prefer EPE's terms to those Furlong requested.

¶ 27 Furlong has something of a point. The Board did not walk through the changes Furlong requested item by item and articulate why it favored EPE's proposal in each individual instance. But recognizing that the Board could have crafted an order that better explained the Board's reasoning does not translate into a basis for concluding that the Board lacked substantial evidence for its decision that the JOA it imposed was just and reasonable.

---

[7] This standard hails from the statute's mandate that any joint operating agreement the Board imposes be "just and reasonable." UTAH CODE § 40-6-6.5(2)(b).

¶ 28 In *McElhaney v. City of Moab*, we discussed the type of findings a substantial evidence standard of review implies in an administrative setting. 2017 UT 65, ¶ 41, --- P.3d ---. In that case, the Moab City Council, sitting as a land use authority, denied a conditional use permit but failed to provide a decision that contained any written findings of fact. *Id.* ¶¶ 6, 7, 41. We "recognized that without sufficiently detailed findings that 'disclose the steps by which' an administrative agency reaches its ultimate factual conclusions, 'this Court cannot perform its duty of reviewing the [ ] order in accordance with established legal principles and of protecting the parties and the public from arbitrary and capricious administrative action.'" *Id.* ¶ 36 (alteration in original) (citation omitted).

¶ 29 We ultimately concluded that the Moab City Council had failed to produce an acceptable order and remanded. *Id.* ¶¶ 41–42. We noted that the City Council had made absolutely no findings to support its decision, and the basis for the decision was entirely unclear. *Id.* ¶ 39. Indeed, the disparate statements of the individual council members at the hearing were the only information the McElhaneys had to explain why the City Council denied their conditional use permit. *Id.* ¶ 7.

¶ 30 In contrast to the decision before us in *McElhaney*, the Board's order informed Furlong of the basis of its decision. The order recited that "[t]he [AAPL] model-form-based JOA proposed by EPE is similar to other [joint operating agreements] previously adopted by this Board in prior compulsory pooling matters." The Board also reasoned that "[joint operating agreement] terms materially the same as those proposed by EPE in this matter have been agreed upon and are presently in effect between other consenting owners within the subject drilling unit." These are "sufficiently detailed findings" such that Furlong knew why the Board ruled the way it did. *Id.* ¶ 36. Unlike in *McElhaney*, the Board gave Furlong notice of what it would need to challenge on appeal. And, these findings allowed us to perform our duty of ensuring that there was substantial record evidence to support the Board's decision.[8] *See id.*

---

[8] This is not to suggest that the Board's order was perfect or even laudable. It could have done a better job of reciting the facts that led the Board to conclude that "the terms of the EPE proposal are just and reasonable." But the order gave Furlong notice of the rationale behind the Board's decision. And the Board outlined its findings

(continued . . .)

¶ 31   And substantively, the Board heard substantial evidence to support the conclusion that the JOA was just and reasonable. The terms the Board declined to modify were based on the model AAPL form. Furlong's own witness testified that, when developing a joint operating agreement, the model form was one source to consult. The Board had approved similar joint operating agreements before. And the record before the Board included evidence that every other consenting owner in this drilling pool adopted a materially identical joint operating agreement.

¶ 32   Moreover, EPE introduced the testimony of Michael John Wachler—an EPE employee who participated in JOA negotiations. Wachler had negotiated over sixty joint operating agreements in the Uintah Basin. Wachler addressed Furlong's proposed changes and, as detailed above, explained EPE's reasons for rejecting each of Furlong's proposals.[9]

---

with sufficient precision that we could have a meaningful discussion on appeal about what occurred below and whether record evidence supported the Board's decision.

In large degree, three factors salvage the Board's order. First, Furlong's proposed changes to the JOA presented the Board with a relatively simple and straightforward case that could be resolved with a relatively simple and straightforward analysis. Second, the statute authorizes the Board to choose between operating agreements the parties present. *See infra* ¶ 36. This permitted the Board to skate by with a less detailed analysis because it only needed to explain the basis for its conclusion that the option it chose was just and reasonable. Finally, the Board's analysis applies equally to each of Furlong's challenges. This allowed the Board to issue an order that lumped all the challenges together. Although the Board's order clears the substantial evidence bar in this instance, a more complicated case or one with more varied challenges could present a horse of a different color.

[9] Furlong argues that Walcher was not credible because in Walcher's experience a non-operator had never asked for different terms. But that does not completely discount his testimony concerning EPE's reasons for rejecting Furlong's suggested changes. And we are not in the business of reweighing credible evidence when conducting a substantial evidence review. *See Provo City*, 2015 UT 32, ¶ 8 ("In conducting a substantial evidence review, we do not

(continued . . .)

¶ 33 Although we can sympathize with Furlong's desire to get more explanation from the Board, we cannot conclude that the Board's decision lacked substantial evidentiary support. Nor can we conclude that the Board imposed a JOA that was unjust or unreasonable when the record confirmed that it was based upon the industry accepted model form and was materially the same agreement that the other non-operators in the drilling pool voluntarily agreed to.

¶ 34 In the course of arguing that there was a lack of substantial evidence, Furlong advances a number of policy arguments. For example, Furlong argues that "[j]udicial approval of" a process where "the Board regularly adopts the 'industry standard' model without alteration" "will undermine the public interest under Utah Code [section] 40-6-1, which is to promote development, protect the correlative rights of owners, and benefit the general public." This is an interesting argument, and Furlong might be right.[10] But we cannot use interesting policy arguments as a springboard into modifying the statute's substantial evidence standard. Our review is limited to ensuring that substantial evidence supported the Board's decision. Any argument that the Board should be more open to departure from the standard industry form should be made to the legislature.

¶ 35 Simply stated, the record does not permit us to conclude that the Board lacked substantial evidence for its conclusion. The JOA it imposed was based on the model agreement and is materially the same one that the other lease holders in the pooling unit agreed to use. The Board could properly conclude that it was neither unjust nor unreasonable to allow EPE to treat all members of the drilling unit similarly and to require Furlong—which owns 0.12 percent—to abide by an agreement that was materially the same as the others.

¶ 36 Furlong next argues that the Board erroneously applied the law when the Board failed to balance Furlong's interests with those

---

reweigh the evidence and independently choose which inferences we find to be the most reasonable." (citation omitted)).

[10] Then again, it might not. Furlong provides us with no evidence to support the assertion that the Board's reliance on the model agreement stifles innovation.

of EPE.[11] The pertinent law states "[i]n the absence of a written agreement for pooling, the board may enter an order pooling all interest in the drilling unit . . . ." UTAH CODE § 40-6-6.5(2)(a). The statute gives the Board leeway to determine what the order should contain and invests the Board with considerable discretion to decide what terms it includes in that order. The Board can adopt terms from an agreement that "is in effect between the consenting owners," or from those "submitted by any party to the proceeding," or even those it submits on its own motion. *Id.* § 40-6-6.5(2)(c). The Board's discretion is bounded by the requirement that the order be "just and reasonable." *Id.* § 40-6-6.5(2)(b).

¶ 37  Furlong argues that the Board erroneously interpreted the law because it did not balance what Furlong wanted with what EPE wanted. As an initial matter, nothing in the statute expressly requires the Board to balance the parties' interests when deciding the form of a joint operating agreement. *See id.* § 40-6-6.5(2). Finding nothing of help in the statute, Furlong extracts support for its proposition from *Harken Southwest Corp. v. Board of Oil, Gas, & Mining*, 920 P.2d 1176 (Utah 1996). In *Harken*, we said that:

> [S]pacing orders must "be made upon terms and conditions that are just and reasonable." [UTAH CODE] § 40-6-6(5)(a). Thus, spacing orders are dependent not only on a variety of factual determinations, but also on the need to balance the competing interests of affected parties and on the general requirement that they be reasonable.

920 P.2d at 1179.[12]

---

[11] Utah Code section 63G-4-403(4)(d) authorizes a challenge of a formal adjudicative proceeding where a party claims the "agency has erroneously interpreted or applied the law . . . ."

[12] Furlong also resorts to the statute's declaration of public interest, arguing that the Board's adoption of this JOA did not "fully protect[]" its interest by failing to balance the competing considerations. That policy statement reads:

> It is declared to be in the public interest to foster, encourage, and promote the development, production, and utilization of natural resources of oil and gas in the state of Utah in such a manner as will prevent waste; to authorize and to provide for the operation and

(continued . . .)

¶ 38 Furlong relies on this language to argue that "[t]he Board was required to balance the interests of the parties." But Furlong misreads *Harken*. When we stated that spacing orders are partly "dependent . . . on the need to balance the competing interests," we did not articulate a new test. *Id.* Indeed, in *Harken,* we ultimately relied on the existing statutory requirement; spacing orders—like the pooling orders at issue here—must be "just and reasonable." UTAH CODE §§ 40-6-6(5)(a), 40-6-6.5(2)(b).

¶ 39 In other words, *Harken* stands for the unremarkable proposition that to be just and reasonable, in some cases the Board may have to "balance the competing interests of affected parties." 920 P.2d at 1179. But this does not conjure a test different from that found in the statute or impose an obligation on the Board to ensure that the parties' interests are in perfect equipoise. The Board understood its mandate—any joint operating agreement needed to

---

development of oil and gas properties in such a manner that a greater ultimate recovery of oil and gas may be obtained and that the correlative rights of all owners may be fully protected; to provide exclusive state authority over oil and gas exploration and development as regulated under the provisions of this chapter; to encourage, authorize, and provide for voluntary agreements for cycling, recycling, pressure maintenance, and secondary recovery operations in order that the greatest possible economic recovery of oil and gas may be obtained within the state to the end that the land owners, the royalty owners, the producers, and the general public may realize and enjoy the greatest possible good from these vital natural resources.

UTAH CODE § 40-6-1. The general statement of policy—to the extent it even supports Furlong's position—does not override the statutory test that the joint operating agreement be just and reasonable. "While some statutes have a policy section and some have a preamble, the effect to be given these provisions is the same: they provide guidance to the reader as to how the act should be enforced and interpreted, but they are not a substantive part of the statute." *Price Dev. Co., L.P. v. Orem City*, 2000 UT 26, ¶ 23, 995 P.2d 1237. In other words, the statement of policy might, in some circumstances, influence our interpretation, but it does not rewrite subsequent sections of the code.

be just and reasonable.[13] That is the statutory requirement and Furlong's argument that the Board erroneously applied the law falls wide of the mark.

## CONCLUSION

¶ 40  We can understand Furlong's desire for more explanation in the Board's order. We cannot, however, transform that understanding into a conclusion that the Board failed to follow its statutory mandate. The Board correctly applied the law and rendered a decision supported by substantial evidence. That is what the statute required. We affirm.

––––––––––––––

---

[13] Furlong also argues under Utah Code section 63G-4-403(4)(e) that the Board "failed to follow prescribed procedure . . . ." Furlong claims the Board "arbitrarily" ignored "Furlong's reasonable requests for amended terms" and "abused its discretion [by imposing] EPE's proposed JOA contract . . . word-for-word against . . . Furlong without analyzing the particular facts of the case." This is nothing more than Furlong's substantial evidence argument dressed in another cloak. The Board did not ignore Furlong's requested changes; it denied them. Substantial evidence supports the denial and the statute ends our inquiry there.