**2020 UT App 174**

# THE UTAH COURT OF APPEALS

ALLAN R. STAKER,
Appellant,
*v.*
TOWN OF SPRINGDALE,
Appellee.

Opinion
No. 20190641-CA
Filed December 31, 2020

Fifth District Court, St. George Department
The Honorable Matthew L. Bell
No. 170500349

Bruce C. Jenkins and Kimball A. Forbes, Attorneys
for Appellant

J. Gregory Hardman and Devin Snow, Attorneys
for Appellee

JUDGE KATE APPLEBY authored this Opinion, in which
JUDGE DIANA HAGEN concurred. JUDGE JILL M. POHLMAN
concurred in part and dissented in part, with opinion.

APPLEBY, Judge:

¶1 Allan R. Staker applied for a conditional use permit to operate a public parking lot (Proposed Lot) on a parcel of property (Property) he owns in Springdale, Utah. The Springdale Town Council (Town Council) denied his application, which denial the town's Appeal Authority (Appeal Authority) affirmed. Staker petitioned for review with the district court, which ultimately upheld the Appeal Authority's decision and dismissed Staker's petition. On appeal, Staker contends the district court erred because the Appeal Authority's decision was not supported by substantial evidence and was illegal. We affirm.

## BACKGROUND

¶2     Staker owns the Property, a three-acre parcel of land with a house in Springdale, Utah. The Property is on the southeast side of Zion Park Boulevard, a road connecting to the southeast entrance of Zion National Park.

¶3     In January 2017, Staker applied for a conditional use permit to operate the Property as a parking lot. Staker submitted a concept plan with his application, which originally proposed a parking area with 83 spaces,[1] removal of the house on the Property, and planting screening vegetation next to the neighboring property lines.

¶4     The Property is zoned as "Valley Residential," a zone "established to provide areas . . . where residential uses may be harmoniously integrated with incidental agricultural pursuits" and "intended to retain land in parcels large enough to provide efficient and attractive residential development which preserves the historic open agricultural and farm type impression of the area." Springdale, Utah, Code § 10-9B-1 (2020).[2] The Property is immediately adjacent to residences. But the zoning of the surrounding properties includes a mix of residential and commercial uses. The area south and southwest of the Property is zoned Village Commercial, allowing the potential for "low impact commercial and service uses" that may be "harmoniously integrated with low and medium density

---

1. During the application process, the number of parking spaces was "narrowed down to between 50–60 spaces."

2. Although Staker submitted his application in 2017, the parties have not provided us the relevant 2017 code provisions to assist in our review. But with two notable exceptions, *see infra* ¶ 5, the relevant code provisions appear to be the same, and we therefore cite the current version for convenience.

residential uses," *id.* § 10-11B-1, while the properties to the west, north, and northeast are zoned residential.

¶5    When Staker applied for the conditional use permit, parking lots were allowed as conditional uses in the Valley Residential zone.[3] Recognizing that conditional uses "may only be suitable in specific locations," *id.* § 10-3A-1, the Springdale Town Code (Code) required the Planning Commission and the Town Council to decide whether certain standards had been or could be met "through the imposition of the proposed conditions on the use," including that the proposed use not "unreasonably interfere with the lawful use of surrounding properties" (Standard B) or "create a need for essential Municipal services which cannot be reasonably met within three (3) months and the party seeking the conditional use is willing and able to contribute to the cost of said services" (Standard C), *id.* § 10-3A-4. The parties also agree the Code at the time required denial of the conditional use permit if the "reasonably anticipated detrimental effects of a proposed conditional use" could not be "substantially mitigated by the proposal or the imposition of reasonable conditions to achieve compliance with applicable standards."

¶6    Before the Planning Commission considered and voted on whether to recommend approval of Staker's application, Springdale's Director of Community Development (DCD) prepared a memorandum (DCD Memorandum) setting forth the standards related to parking lot approvals and analysis of each standard in light of the specific circumstances surrounding the Property. As relevant here, the DCD Memorandum indicated that the Proposed Lot "is adjacent to residential uses" and that it "will impact these surrounding properties with increases in

---

3. Staker acknowledges that, after he filed his application, Springdale amended its ordinances to "prohibit all public parking areas in Valley Residential zones."

traffic, noise, and general activity on the [Property]." The DCD Memorandum stated that if the Planning Commission recommended approval, it "should consider conditions that could help mitigate the impacts," such as "requir[ing] screening, additional landscape buffers, and other similar measures." The DCD Memorandum also indicated the Proposed Lot "has the potential to generate the same amount of noise, or noxious odors as any other parking lot might," and that the Planning Commission "may wish to impose a condition of approval that requires this facility to avoid making loud noises between the hours of 11:00 PM and 7:00 AM."

¶7    The Planning Commission considered Staker's application and, following a public hearing, recommended denying it. The Planning Commission found, among other things, that the Proposed Lot "cannot be screened adequately from surrounding properties," including the "nearby two-story homes." And observing the Code provides that "allowable land uses are established to avoid incompatible uses in close proximity . . . and to preserve the peace, quiet and privacy in the residential zones," the Planning Commission determined, among other things, that the Proposed Lot would be incompatible with Springdale's "General Plan" because it would commercialize and "change the appearance and character of" the Property's Village Residential designation.

¶8    The matter then went before the Town Council. After a public hearing, the Town Council denied Staker's application. In addition to relying on the Planning Commission's recommendation, the Town Council made several findings, including that the "proposed use is in the middle of an existing residential neighborhood," "is less than 20 feet from a residence," and "[t]he front yard of a residence to the northeast would look onto" the Proposed Lot; the "proposed use will unreasonably interfere with the lawful use of surrounding properties because it will substantially increase traffic, activity, and noise in an existing residential neighborhood" and "bring

congestion from other areas"; the "proposed use will emit excessive noise from parking patrons and their vehicles"; and "the proposed use will create a need for essential municipal services that cannot be met within three months because it will bring concentrated ridership on shuttles" into Zion National Park and "will require public restrooms in concern for public health" purposes. In making its findings, the Town Council relied on the applicable conditional use standards, the application materials, the Planning Commission's recommendation and associated minutes, the DCD Memorandum, and community input.

¶9　Staker appealed the denial of the conditional use permit to the Appeal Authority. He argued, among other things, that the Town Council did not properly apply Springdale's conditional use permit standards when considering his application and that its decision was arbitrary and capricious.

¶10　After a hearing, the Appeal Authority affirmed the Town Council's decision. Noting there was no showing that the Planning Commission's or the Town Council's findings were clearly erroneous, the Appeal Authority deferred to those findings and made additional findings in support of affirmance. The Appeal Authority found, among other things, that the Planning Commission and the Town Council "thoroughly" discussed "site conditions, surrounding property uses, potential adverse impacts on surrounding properties, and whether those impacts could be mitigated." And, like the Town Council, the Appeal Authority found that "[t]he surrounding properties are used primarily for residential purposes" and the Proposed Lot "would be constructed near residential uses"; the "proposed use would unreasonably interfere with the lawful use of surrounding properties"; the use would "create a need for essential municipal services that cannot be met within three months"; and the use would "emit excessive noise from parking patrons" that would impact neighboring residences.

¶11    The Appeal Authority concluded the Town Council's decision was not arbitrary or capricious. It emphasized that even though a parking lot was an "allowable use" in the Valley Residential zone, it was only conditionally so, subject to whether "reasonable conditions" could be imposed to mitigate the "reasonably anticipated detrimental effects" of the Proposed Lot "in accordance with" the applicable standards. (Quotation simplified.) In this respect, the Appeal Authority concluded there was substantial evidence the Proposed Lot would not meet Standard B—that is, the use would "unreasonably interfere with the lawful use of surrounding properties and that proposed conditions could not be imposed that would substantially mitigate the reasonably anticipated detrimental effects on the surrounding properties." The Appeal Authority interpreted the term "lawful use" to include "the right to quietly and peaceably enjoy [one's] property." And it applied that interpretation to determine that, based on the record, "a reasonable mind could conclude . . . that operating a commercial parking lot in the middle of an existing residential neighborhood would increase both vehicular and foot traffic and bring with it the inevitable noise created when cars and people enter and exit the location"—all of which would "unreasonably interfere" with the surrounding properties' lawful use.[4]

¶12 Staker petitioned for review of the Appeal Authority's decision in the district court. Among other things, he claimed the decision was arbitrary and capricious because

---

4. The Appeal Authority additionally determined the proposed use would not meet Standard C, and it rejected Staker's contention that the denial of his permit was arbitrary and capricious because other conditional use permits for parking lots in the Village Residential zone were approved. But as further noted below, *infra* nn. 8–9, we do not substantively address either issue.

it was "not supported by substantial evidence in the record" and it was "illegal because it [was] based on incorrect interpretations of . . . land use regulations and contrary to law." He also claimed the court "should not give the Appeal Authority's Decision the presumption of validity," because there was no record "as to reasonable conditions that would mitigate" the anticipated detrimental effects of the Proposed Lot.

¶13    The district court dismissed Staker's petition with prejudice. First, it determined the Appeal Authority's decision was not illegal, explaining there was "no evidence . . . that the decision was based on an incorrect interpretation of a land use regulation or was otherwise contrary to law."

¶14    Next, the court found the Appeal Authority's decision was one a "reasonable mind could reach" and was "based on substantial evidence in the record." Specifically, the court rejected Staker's assertion that Springdale made "consent of neighboring landowners a criterion" for approving or denying Staker's application. The court also concluded substantial evidence supported the Appeal Authority's determination that the Proposed Lot did not meet Standard B, because the use would unreasonably interfere with the neighboring residential uses, stating that the Appeal Authority's decision "acknowledges what were the natural consequences of operating a commercial parking lot situated close to other residents."

¶15    Finally, on the issue of mitigation, the court noted that the record is "less than ideal with respect to details" but that the "potential for mitigation was considered" and ultimately rejected, particularly given that the Proposed Lot was "situated so close to other residences."

¶16    Staker appeals.

ISSUE AND STANDARD OF REVIEW

¶17   Staker challenges the denial of his conditional use permit application. He contends the district court erred in dismissing his petition for review because the Appeal Authority's decision was illegal and not supported by substantial evidence. In an appeal of an administrative order, "[w]e afford no deference" to the district court's decision, reviewing it for whether the court "correctly determined whether the administrative decision was arbitrary, capricious, or illegal." *McElhaney v. City of Moab*, 2017 UT 65, ¶ 26, 423 P.3d 1284; *see* Utah Code Ann. § 10-9a-801(3) (LexisNexis 2015). "We will not disturb the decision of a land use authority or an appeal authority unless the decision is arbitrary and capricious or illegal." *LJ Mascaro Inc. v. Herriman City*, 2018 UT App 127, ¶ 16, 428 P.3d 4.

ANALYSIS

¶18   Staker raises two main arguments on appeal. First, he contends the district court incorrectly concluded that substantial evidence supported the Appeal Authority's decision to deny his conditional use permit application. Second, he contends the court incorrectly concluded that the Appeal Authority's decision was not illegal.

¶19   "Utah's Municipal Land Use Development and Management Act (MLUDMA) empowers municipalities to zone the territory within their boundaries and to regulate land uses," *McElhaney v. City of Moab*, 2017 UT 65, ¶ 27, 423 P.3d 1284; *see also* Utah Code Ann. § 10-9a-501 (LexisNexis 2015),[5] and to specifically approve or deny conditional uses, *see* Utah Code Ann. § 10-9a-507. A conditional use is "a land use that, because

---

5. We cite the version of the Utah Code in effect at the time of Staker's 2017 application for a conditional use permit.

of its unique characteristics or potential impact on the municipality, surrounding neighbors, or adjacent land uses, may not be compatible in some areas or may be compatible only if certain conditions are required that mitigate or eliminate the detrimental impacts." *Id.* § 10-9a-103(5). "A conditional use shall be approved if reasonable conditions are proposed, or can be imposed, to mitigate the reasonably anticipated detrimental effects of the proposed use in accordance with applicable standards." *Id.* § 10-9a-507(2)(a). But "[i]f the reasonably anticipated detrimental effects of a proposed conditional use cannot be substantially mitigated by the proposal or the imposition of reasonable conditions to achieve compliance with applicable standards, the conditional use may be denied." *Id.* § 10-9a-507(2)(b).

¶20　Here, Springdale has established standards for evaluating conditional uses. To begin with, the Property is zoned as Valley Residential, which the Code designates as a zone "established to provide areas . . . where residential uses may be harmoniously integrated with incidental agricultural pursuits" and "intended to retain land in parcels large enough to provide efficient and attractive residential development which preserves the historic open agricultural and farm type impression of the area." Springdale, Utah, Code § 10-9B-1 (2020). At the time of Staker's application, parking lots were designated as an allowable conditional use in the Valley Residential zone. In that respect, the Code established "[a]llowable land uses," including conditional uses, "to avoid incompatible uses in close proximity, preserve the Town's unique village character, promote tourism based economy in the commercial zones, and to preserve the peace, quiet, and privacy in residential zones." *Id.* § 10-7A-1.

¶21　The Code provides more specific standards for evaluating conditional uses. "If the reasonably anticipated detrimental effects of a proposed conditional use cannot be substantially mitigated by the proposal or the imposition of reasonable conditions to achieve compliance with applicable standards," the

parties agree the Code at the time required the use be denied. As relevant here, "[i]n considering what conditions may substantially mitigate the detrimental effects of the use, the Planning Commission and Town Council shall each find that the following general standards have been met or can be met through the imposition of the proposed conditions on the use," including Standard B—"[t]he proposed use shall not unreasonably interfere with the lawful use of surrounding properties"—and Standard C—"[t]he proposed use shall not create a need for essential Municipal services which cannot be reasonably met within three (3) months." *Id.* § 10-3A-4.

¶22　Applying these principles, we address Staker's challenges to the district court's order.

## I. Substantial Evidence

¶23　Staker argues the Appeal Authority's decision was arbitrary and capricious because its decision that the proposed use would unreasonably interfere with the lawful uses of surrounding properties, and in a way that could not be substantially mitigated, was not supported by substantial evidence.

¶24　As discussed above, we will uphold a land use authority's decision unless it is arbitrary and capricious. *See* Utah Code Ann. § 10-9a-801(3)(c) (LexisNexis 2015). "[A] decision is arbitrary and capricious when it is not supported by substantial evidence in the record." *LJ Mascaro Inc. v. Herriman City*, 2018 UT App 127, ¶ 20, 428 P.3d 4. "Substantial evidence is that quantum and quality of relevant evidence that is adequate to persuade a reasonable mind," and on review "we will consider all the evidence in the record, both favorable and contrary," with the aim of determining "whether a reasonable mind could reach the same conclusion as the land use authority." *Checketts v. Providence City*, 2018 UT App 48, ¶ 18, 420 P.3d 71 (quotation simplified); *see also Kilgore Cos. v. Utah County Board of*

*Adjustment*, 2019 UT App 20, ¶ 24, 438 P.3d 1025. In doing so, we "do not weigh the evidence anew or substitute our judgment for that of the municipality." *LJ Mascaro Inc.*, 2018 UT App 127, ¶ 20 (quotation simplified); *see also J.P. Furlong Co. v. Board of Oil, Gas & Mining*, 2018 UT 22, ¶ 25, 424 P.3d 858.

¶25 The district court concluded the Appeal Authority's decision was "based on substantial evidence in the record" and was a decision "a reasonable mind could reach." Specifically, the court concluded that substantial evidence supported the Appeal Authority's decision that the proposed use did not meet the requirements of Standard B. It determined the Appeal Authority's decision that the "proposed use would interfere with lawful uses of surrounding properties" in light of the close proximity to surrounding residences "acknowledge[d] what were the natural consequences of operating a commercial parking lot situated close to other residents." And while the record was "less than ideal with respect to details on the mitigation issue," the court concluded "the potential for mitigation was considered and, in light of the concerns noted"—particularly "the finding[] that [the Proposed Lot] is situated so close to other residences"—"rejected." In doing so, the court acknowledged "Springdale solicited information from members of the public" in rendering its decision, but determined the feedback it received was "permissible" and the town "did not make consent of neighboring landowners a criterion for the issuance or denial of the [conditional use permit]."

A.     Standard B

¶26 Staker first argues the district court erred in dismissing his petition because, in his view, there is no substantial evidence supporting the Appeal Authority's decision regarding Standard B—that the proposed use would "unreasonably interfere with the lawful use of surrounding properties." *See* Springdale, Utah, Code § 10-3A-4(B) (2020).

¶27   We are not persuaded. A central concern vis-à-vis Standard B, as expressed by the Town Council and adopted by the Appeal Authority, was the close proximity of the Proposed Lot to adjacent residential uses. Indeed, as Staker acknowledges, one of the surrounding residential uses is a house "20 feet away from the [Proposed Lot]." In light of that proximity, the Town Council and the Appeal Authority considered the potential effects of the Proposed Lot, including increases in traffic, noise, and other activities. For example, the Town Council found the "proposed use is less than 20 feet from a residence" and "[t]he front yard of a residence to the northeast would look onto" the Proposed Lot. In addition to adopting the Town Council's findings, the Appeal Authority found the Proposed Lot "would be constructed near residential uses" and the "surrounding properties are used primarily for residential purposes." And, indeed, the district court's dismissal recognized the concern about the effects in light of the specific location, noting that the Proposed Lot was "so close to other residences" and that the findings regarding noise, congestion, and other similar effects were "natural consequences of operating a commercial parking lot situated close to other residents."

¶28   Substantial evidence supported the concern regarding the reasonableness of the Proposed Lot's interference with the closely situated surrounding residential uses and, by extension, the decision that the proposed use did not meet Standard B. *See Checketts*, 2018 UT App 48, ¶ 18 (defining substantial evidence as "that quantum and quality of relevant evidence that is adequate to persuade a reasonable mind" (quotation simplified)). First, Staker's application included a design of the Proposed Lot overlaid on a bird's-eye view photograph of the Property, which plainly displayed the close proximity of the Proposed Lot to the surrounding residential properties. Likewise, the materials Staker presented to the Appeal Authority included several additional diagrams and overhead photographs of the Proposed Lot and surrounding properties that again portrayed the close

proximity of the Proposed Lot to the surrounding properties and residential uses.

¶29    Next, before the Planning Commission's meeting on Staker's application, the DCD Memorandum addressed the conditional use permit standards, including Standard B, and its recommendations, based on a specific evaluation of the Proposed Lot, under each. For Standard B, the DCD Memorandum indicated the Proposed Lot was "adjacent to residential uses" and it would "impact these surrounding properties with increases in traffic, noise, and general activity on the [Property]." It also generally noted the "property to the south of the proposed parking contains a residence that will be located very near the proposed parking area." After the Planning Commission meeting, the DCD updated the Memorandum for the Town Council's use, and the updated Memorandum additionally indicated that the "proximity of adjacent residentially used properties," including "one residence . . . located approximately 20 feet from the parking area," justified careful consideration of the impacts the Proposed Lot would have on surrounding properties. It also noted the public's perception of the anticipated impacts, which included "noise, garbage accumulation, loss of privacy, loitering, [and] headlights directed into adjacent properties."

¶30    And in this respect, during the Planning Commission and Town Council meetings, the public provided input about the Proposed Lot's impact on surrounding properties, especially given the surrounding properties' uses. In particular, members of the public highlighted the anticipated and inherent impacts the Proposed Lot would impose, given the anticipated use of the Proposed Lot, its size, and its location. *See generally Thurston v. Cache County*, 626 P.2d 440, 445 (Utah 1981) ("While it is true that the consent of neighboring landowners may not be made a criterion for the issuance or denial of a conditional use permit, there is no impropriety in the solicitation of, or reliance upon, information which may be furnished by other landowners in the

vicinity of the subject property at a public hearing."). In the Planning Commission meeting, the public expressed concerns about noise, odors, and the overall increase in activity in the immediate area, and in close proximity to neighboring residences. For example, members of the public expressed their beliefs that screening would not be adequate, and one commenter stated her belief that the Staker application had "tremendously more impact on residences" than other active applications for similar conditional parking uses that did not involve properties surrounded by residential uses, explaining that the Staker application was therefore different in kind in terms of the effects it would have on neighboring properties. The public also expressed concerns about "headlights," "managing people from wandering onto private property," "noise and air pollution," and "safety and the lack of lighting." And one member of the public in particular raised the issue that Staker's property line was "about twenty" feet from a neighboring residence.

¶31 Likewise, during the Town Council meeting, the public expressed several concerns with the Proposed Lot, including the effect on the six neighboring properties "of vehicles coming in and out of" the Proposed Lot on a consistent basis, "excessive noise, odors[,] and screening" concerns, and the traffic impacts to the neighborhood. Several neighbors also submitted letters in anticipation of the town's decision on Staker's application, many of which detailed similar concerns with respect to potential negative impacts on surrounding properties.[6]

---

6. In evaluating Staker's application, several of the Planning Commission and Town Council members expressed similar views that the use could not meet Standard B in light of the anticipated and inherent impacts of the Proposed Lot, highlighting the increased noise, odors, activity, and overall

(continued…)

¶32 Taken together, this constituted substantial evidence from which a reasonable mind could conclude that the Proposed Lot would unreasonably interfere with the lawful use of the surrounding properties. *See Checketts*, 2018 UT App 48, ¶ 18. It provided a sufficient basis to conclude that the reasonably anticipated and inherent effects of the Proposed Lot, such as increased noise and activity, were particularly problematic given the location of the Proposed Lot and, specifically, its close proximity to surrounding residential uses.

¶33 Nevertheless, Staker claims the district court's dismissal of his petition was improper because the Appeal Authority relied "solely on public clamor" in rendering its decision. But although Staker is correct that "'public clamor' . . . [is] not a legally sufficient basis for denying [a conditional use] permit," *see Davis County v. Clearfield City*, 756 P.2d 704, 711–13 & n.9 (Utah Ct. App. 1988), we agree with the court that, while the Town Council "solicited information" from the public, "it did not make consent of neighboring landowners a criterion" for either approving or denying the conditional use permit. It is not improper to "solicit" and rely on "information which may be furnished by other landowners in the vicinity of the subject property at a public hearing," *see Thurston*, 626 P.2d at 445, so long as the decision is not *solely* based on the public's concerns or consent, *see Davis County*, 756 P.2d at 711–13 & n.9. And, as discussed above, it is apparent the public's expressed concerns did not constitute the only evidence on which the Appeal Authority's decision was based. Moreover, there is no indication in the record that the Town Council conditioned approval on the public's support or otherwise permitted the public's response to dictate the denial. *Cf. Stucker v. Summit County*, 870 P.2d 283,

_____

(…continued)

interference with the surrounding residences' "peace, quiet, and privacy."

289–90 (Utah Ct. App. 1994) (concluding that a planning commission's denial of a "request for a permit due to the incompatibility of the project with surrounding land uses" was not the product of a delegation of "veto power to the [applicant's] neighbors" where the planning commission "use[d] information gathered from neighbors in making [the] decision" to deny the permit); *Davis County*, 756 P.2d at 711–13 & n.9 (concluding the city council impermissibly based its denial of a conditional use permit on "public clamor," as evidenced by the "curious action taken at the Planning Commission hearing, where citizens in attendance were asked to vote on the application").[7]

---

7. Staker also briefly suggests the Appeal Authority's decision was not supported by substantial evidence because it did not explain how the anticipated effects of the Proposed Lot *unreasonably* interfered with neighboring properties. As our supreme court explained in *McElhaney v. City of Moab*, 2017 UT 65, 423 P.3d 1284, the term "substantial evidence" includes a requirement that the "findings of fact and conclusions of law . . . are adequately detailed to permit meaningful appellate review" and "resolve issues which are relevant to the legal standards that will govern the agency's decision." *Id.* ¶ 35 (quotation simplified). Here, we conclude the Appeal Authority's decision was sufficiently detailed with respect to the reasonableness issue. In addition to finding that the Planning Commission and Town Council engaged in a "thorough" discussion of the "adverse impacts on surrounding properties," the Appeal Authority adopted the Town Council's findings, which emphasized the close proximity of the Proposed Lot to the surrounding residential uses, and also found that the "surrounding properties are used primarily for residential purposes" and the Proposed Lot "would be constructed near residential uses." Additionally, the Appeal Authority explained

(continued…)

¶34    Staker also argues the Appeal Authority denied the permit based on the general and inherent impacts of operating a parking lot, "without any particularized evidence that the [Proposed Lot] would adversely affect surrounding properties any more than any other parking lot would." But, as discussed above, the main issue regarding Standard B was the impact of the Proposed Lot in light of its specific location and close proximity to neighboring properties and residential uses. By focusing on the anticipated effects in light of the particular location of the Proposed Lot, the Appeal Authority and the district court necessarily relied on particularized evidence about the Proposed Lot and its location in denying the application and dismissing the petition.

¶35    Finally, Staker claims the Appeal Authority's findings are not themselves substantial evidence, and particularly challenges its findings that the Proposed Lot would be "in the middle of a residential neighborhood," would be "adjacent to existing residential homes," and would "require the removal of an existing residence." But his challenges to these findings do not persuade us that the district court erred. First, Staker's challenge to the finding about the Proposed Lot being in the "middle of a residential neighborhood" essentially recites the evidence about the zoning, use, and location of surrounding properties and asks us to reweigh it in his favor, which we will not do on review. *See LJ Mascaro Inc.*, 2018 UT App 127, ¶ 20. Next, he suggests the

---

(…continued)
that "operating a commercial parking lot in the middle of an existing residential neighborhood," given the increases of activity and noise generated by such an operation, "would unreasonably interfere" with the surrounding properties. In our view, these findings and the associated explanation adequately explained why the Appeal Authority determined the use's interference was unreasonable.

adjacency finding "runs afoul of [Springdale's conditional use] Standards" because it suggests a decision "based on criteria outside the applicable standards." But, as discussed above, the decision to deny the permit was not based solely on the adjacency of the Proposed Lot to residential homes but rather on the convergence of the anticipated and inherent impacts of the Proposed Lot with the close proximity of the surrounding uses. And, as Staker acknowledges, the location of the Proposed Lot vis-à-vis surrounding uses is relevant to the overall Standard B inquiry. Finally, Staker asserts the removal of the house is not substantial evidence, because it is irrelevant to the Standard B inquiry. But we agree with Springdale that the removal of the residence on the Proposed Lot is relevant to the Standard B inquiry as it bears on the proximity issue as well as the manner in which the proposed use would affect the surrounding neighborhood.[8]

¶36   In sum, we are not persuaded by Staker's arguments challenging the existence of substantial evidence supporting the Appeal Authority's Standard B decision. Rather, in our view, the district court correctly concluded that substantial evidence supported the Appeal Authority's decision that the Proposed Lot unreasonably interfered with the lawful use of the surrounding properties.

---

8. Staker also suggests the "Appeal Authority's refusal to consider approvals of other parking lots in the Valley Residential zone was arbitrary and capricious." But we review the district court's decision, not the Appeal Authority's. *See McElhaney*, 2017 UT 65, ¶ 26 ("[I]n the appeal of an administrative order, we review the intermediate court's decision."). The district court's decision did not address this issue, and apart from noting this, Staker makes no argument that the court erred by not considering it. Accordingly, we do not address it.

B.      Mitigation

¶37    Staker also challenges the district court's decision regarding mitigation of the Proposed Lot's anticipated detrimental effects. He contends there is no substantial evidence that the proposed conditions "could not substantially mitigate the [Proposed Lot's] anticipated detrimental effects." Specifically, he argues the Appeal Authority's findings are not sufficiently detailed and do "not inform the reader why the [it] ruled the way it did on mitigation." And, acknowledging the district court's conclusion that there was substantial evidence on the record on the mitigation issue where the Proposed Lot was "situated so close to other residences," Staker argues that "closeness to residences is not evidence adequate to convince a reasonable mind that the detrimental effects of the [Proposed Lot] could not be substantially mitigated." We disagree.

¶38    The district court stated that, although the record was "less than ideal" on the mitigation issue, "the potential for mitigation was considered and, in light of the concerns noted, rejected." It noted Staker's proposal "included visual and sound barriers," and there was "consideration of reducing the number of parking spaces or moving them back." But the court was persuaded that "those mitigation efforts were unconvincing . . . , given the findings that [the proposed] lot is situated so close to other residences."

¶39    During the application process, various mitigation conditions were proposed and considered. The DCD Memorandum recommended that the Planning Commission, and later the Town Council, consider mitigation conditions, such as "screening, additional landscape buffers," and "increased setback from existing residentially used structures." Staker also proposed mitigation options, including signs requesting patrons to respect the neighbors' privacy and keep noise to a minimum, setting the hours of operation from 7 a.m. to 11 p.m., developing vegetation screening, and providing

no lighting. And it is apparent from the record that the mitigation issue was considered both at the Planning Commission and the Town Council meetings. Indeed, the Appeal Authority found that, during deliberations, the Planning Commission and Town Council engaged in a "thorough discussion of site conditions, surrounding property uses, potential adverse impacts on surrounding properties, and whether those impacts could be mitigated," and it concluded there was substantial evidence in the record from which a reasonable mind could conclude that "proposed conditions could not be imposed that would substantially mitigate the reasonably anticipated detrimental effects" of the Proposed Lot on the surrounding properties.

¶40 The Appeal Authority's findings were adequate on the mitigation issue. In *McElhaney v. City of Moab*, 2017 UT 65, 423 P.3d 1284, our supreme court recognized the term "substantial evidence" in the administrative context includes a requirement that the "administrative agency . . . make findings of fact and conclusions of law that are adequately detailed so as to permit meaningful appellate review," which includes making "findings of fact that resolve issues which are relevant to the legal standards that will govern the agency's decision." *Id.* ¶¶ 34–35 (quotation simplified). In this respect, an administrative agency's decision need not be "perfect or even laudable." *See J.P. Furlong Co. v. Board of Oil, Gas & Mining*, 2018 UT 22, ¶ 30 & n.8, 424 P.3d 858. Rather, findings are sufficiently detailed if they "inform[]" the parties "of the basis" of the administrative agency's decision "such that [the parties] knew why the [agency] ruled the way it did," afford the parties "notice of what [they] would need to challenge on appeal," and "allow[] [an appellate court] to perform" a meaningful review. *See id.* ¶ 30 n.8. (concluding the [agency's] order was sufficient where it gave the petitioner "notice of the rationale behind the [agency's] decision" and "outlined its findings with sufficient precision that [the appellate court]

could have a meaningful discussion on appeal about what occurred below and whether record evidence supported the [agency's] decision").

¶41 Here, as the district court recognized, the Appeal Authority's findings adequately informed the parties "of the basis" and rationale behind its decision. *See id.* ¶ 30 & n.8. The Appeal Authority found that the Planning Commission and the Town Council "thorough[ly]" discussed "whether [the anticipated] impacts" on surrounding properties "could be mitigated," and it deferred to the Planning Commission's and the Town Council's findings on those issues. The Planning Commission's findings included, among other things, a determination that the "nearby two-story homes" "cannot be screened for . . . headlights or from view." And the Town Council's findings, as discussed above, emphasized the close proximity of the Proposed Lot to surrounding properties in denying the permit. The Appeal Authority also made similar findings about the Proposed Lot's proximity to residential uses. And it explained that, where approving the application would "place a parking lot in the middle of a residential neighborhood . . . adjacent to existing residential homes," a reasonable mind could conclude that "proposed conditions could not be imposed that would substantially mitigate the reasonably anticipated detrimental effects on the surrounding properties" from increases in "both vehicular and foot traffic" and the "inevitable noise created when cars and people enter and exit the location." The Appeal Authority's findings and discussion thereby informed Staker that the issue of mitigation was considered but that the Appeal Authority concluded from the record that the anticipated impacts on the surrounding residential uses were too great to be substantially mitigated. In this respect, Staker was informed what he needed to challenge about the Appeal Authority's mitigation determination and, by extension, the Appeal Authority's findings and discussion have allowed a meaningful appellate review. *See id.*

¶42    Likewise, Staker has not persuaded us that the close proximity of the Proposed Lot to the surrounding residential uses is inadequate evidence on which to base the mitigation determination. Although he contends that the Proposed Lot's "closeness" to residential properties is not enough to convince a reasonable mind on the mitigation question, he does not explain why it is not. *See Bank of Am. v. Adamson*, 2017 UT 2, ¶ 12, 391 P.3d 196 ("An appellant who fails to adequately brief an issue will almost certainly fail to carry its burden of persuasion on appeal." (quotation simplified)); *Hess v. Canberra Dev. Co.*, 2011 UT 22, ¶ 25, 254 P.3d 161 (stating "a party's brief must contain meaningful legal analysis," meaning that "a brief must go beyond providing conclusory statements and fully identify, analyze, and cite its legal arguments" (quotation simplified)). And, in our view, it would not be unreasonable to conclude that the various proposed mitigation conditions would not substantially mitigate the anticipated impacts in circumstances where the proposed use would be situated in uniquely close proximity to residential uses, and in circumstances where the use and view of the Proposed Lot could not be adequately screened from nearby residences. After all, a conditional use is rooted in the idea that some uses, due to "unique characteristics or potential impact[s]" on "surrounding neighbors[] or adjacent land uses, may not be compatible in some areas." *See* Utah Code Ann. § 10-9a-103(5) (LexisNexis 2015).

¶43    In sum, we conclude Staker has not shown the district court's dismissal of his petition under Standard B and the inability to substantially mitigate the reasonably anticipated detrimental effects on surrounding properties is not supported by substantial evidence.[9]

---

9. The Appeal Authority additionally denied Staker's permit by finding the proposed conditional use did not meet Standard C, and Staker appeals that aspect of the Appeal Authority's

<span style="float:right">(continued…)</span>

## II. Illegality

¶44    Staker contends the Appeal Authority's decision is illegal. Specifically, he argues it "incorrectly interpreted the meaning of 'lawful use' in Standard B." And, characterizing the Appeal Authority's decision that the Proposed Lot would not comply with Standard B as disregarding a legislative decision "that commercial parking lots were compatible with residential land uses in the Valley Residential zone," Staker asserts the Appeal Authority illegally applied Standard B.

¶45    A land use authority's decision is illegal if it "violates a law, statute, or ordinance in effect at the time the decision was made or the ordinance or regulation adopted." Utah Code Ann. § 10-9a-801(3)(d) (LexisNexis 2015); *see also Outfront Media, LLC v. Salt Lake City Corp.*, 2017 UT 74, ¶ 12, 416 P.3d 389; *Baker v. Park City Mun. Corp.*, 2017 UT App 190, ¶ 28, 405 P.3d 962. Thus, whether a decision is illegal "depends on a proper interpretation and application of the law." *Patterson v. Utah County Board of Adjustment*, 893 P.2d 602, 604 (Utah Ct. App. 1995). We interpret statutes and ordinances according to their plain meaning, assuming, "absent a contrary indication, that the legislature used each term advisedly according to its ordinary and usually accepted meaning." *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863 (quotation simplified); *Cahoon v. Hinckley Town Appeal Auth.*, 2012 UT App 94, ¶ 4, 276 P.3d 1141.

---

(…continued)

decision. However, as Staker recognizes, the district court did not address the Standard C issue, and Staker makes no argument that the court's failure to address Standard C was in error. *See generally McElhaney*, 2017 UT 65, ¶ 26. And where we have affirmed the district court's dismissal on the grounds of Standard B, we need not address this issue further.

¶46   The Appeal Authority rejected Staker's proposed interpretation that "lawful use" means "that his proposed use must somehow result in a surrounding property falling into an illegal use." Instead, the Appeal Authority interpreted "lawful use" as "necessarily includ[ing] the right to quietly and peaceably enjoy that property," observing that reading the language as Staker suggested would render Standard B "inoperative as it is difficult to imagine a proposed use that would effectively convert the lawful use of a surrounding property into an unlawful use." The district court concluded the Appeal Authority's decision was not illegal, stating, "There is no evidence . . . that the decision was based on an incorrect interpretation of a land use regulation or was otherwise contrary to law."

¶47   Staker has not persuaded us that the district court erred by concluding the Appeal Authority's decision was not illegal. Relying on a Hawaii case, *Waikiki Marketplace Inv. Co. v. Chair of Zoning Board of Appeals of City & County of Honolulu*, 949 P.2d 183 (Haw. Ct. App. 1997), Staker suggests the "most meaningful way to read" Standard B is to interpret "lawful use" to mean "compliance with previous zoning laws." (Quotation simplified.) But *Waikiki Marketplace*'s interpretation of the phrase "lawful use" is not persuasive under the circumstances present here. That case involved consideration of whether a storage building was grandfathered[10] in as a nonconforming use under a zoning

_____

10. In general, a "grandfather clause" is a "provision that creates an exemption from the law's effect for something that existed before the law's effective date; specif., a statutory or regulatory clause that exempts a class of persons or transactions because of circumstances existing before the new rule or regulation takes effect." *Grandfather Clause*, Black's Law Dictionary (11th ed. 2019); *see also Grandfather*, Black's Law Dictionary (11th ed. 2019). Thus, a nonconforming use that is grandfathered in is covered

(continued…)

ordinance, which required a certain minimum setback. *Id.* at 192–93. At the time the storage building was built, there was no setback regulation, but a setback minimum was later enacted. *Id.* And under the applicable zoning ordinance, a structure was grandfathered in as a nonconforming use if it was "previously lawful" but thereafter did not comply with enacted setback requirements. *Id.* at 193. Thus, the "dispositive issue" was "whether the terms 'lawful,' as used in [the applicable zoning statute], and 'previously lawful,' as used in [the applicable zoning ordinance], refer to (a) lawfulness under the zoning laws or ordinances or (b) lawfulness under any and all laws, ordinances, or rules to which the addition may be subject." *Id.* The Hawaii Intermediate Court of Appeals ultimately determined, in that specific context, that "whether a structure was grandfathered in as a 'previously lawful' nonconforming structure under the [applicable zoning ordinance] . . . should be measured by reference to the zoning code or ordinance in existence at the time the structure was built." *Id.*; *see also id.* at 196 ("We conclude that the terms 'lawful use' and 'previously lawful,' as used in [the applicable zoning statute and ordinance], refer to compliance with previous zoning laws, not the building codes or other legal requirements that may be applicable to the construction or operation of a structure.").

¶48    Here, in contrast, we are not dealing with the question of how to measure the term "lawful use" (and, by extension, *where to look* to determine what constituted a lawful use). Rather, we

---

(…continued)

by and exempted from later-enacted statutes or regulations. *See id.*; *see generally Hatch v. Kane County Board of Adjustment*, 2013 UT App 119, ¶¶ 11–13, 302 P.3d 146 (discussing nonconforming uses and concluding the county properly determined the land use at issue could not be grandfathered in as a nonconforming use).

are faced with the question of *what constitutes* a lawful use in the context of determining whether a proposed conditional use meets an already known legal standard (in this case, Standard B). Accordingly, *Waikiki Marketplace* does not answer the interpretive question presently before us. And beyond his reliance on *Waikiki Marketplace*, Staker does not further explain why his preferred interpretation accords with the plain language of Standard B or why the district court erred by rejecting it.

¶49   We likewise are unpersuaded by Staker's argument that the Appeal Authority exceeded its authority in applying Standard B. For one thing, Staker's argument relies on an incorrect underlying assumption—that the Appeal Authority determined the Proposed Lot did not comply with Standard B because it was a commercial use. As discussed above, the Appeal Authority, as recognized by the district court, denied the requested use not solely because it was a commercial use; it determined the use was not compatible with the surrounding uses due largely to the Proposed Lot's close proximity to surrounding residential uses. And it is permissible to deny a conditional use in circumstances where, applying relevant legal standards, the use is determined to be incompatible with surrounding uses. *See* Utah Code Ann. §§ 10-9a-103(5), -507(2)(a), (b) (LexisNexis 2015) (setting forth the circumstances under which the conditional use shall be approved and may be denied).[11]

---

11. Staker also contends the Appeal Authority incorrectly interpreted what constitutes an "essential municipal service" under Standard C. But, as noted above, the district court did not address the Appeal Authority's determinations regarding Standard C, and because we affirm the district court's dismissal of the petition as noncompliant of Standard B, we need not address this additional claim of illegality.

¶50 For these reasons, we conclude Staker has not shown the district court's illegality decision was in error.

CONCLUSION

¶51 We conclude the district court did not err by dismissing Staker's petition for review of the denial of his conditional use application.

¶52 Affirmed.

————————

POHLMAN, Judge (concurring and dissenting):

¶53 Although I join Part II of the majority opinion, I disagree with Part I because I do not share my colleagues' view, and the view of the district court, that substantial evidence supported the Appeal Authority's denial of Staker's conditional use permit.

¶54 The district court first considered whether there was substantial evidence to support the Appeal Authority's determination that the Proposed Lot would "unreasonably interfere with the lawful use of surrounding properties." *See* Springdale, Utah, Code § 10-3A-4(B) (2020). The court concluded that there was substantial evidence, stating that the Appeal Authority's "decision acknowledges what were the natural consequences of operating a commercial parking lot situated close to other residents."

¶55 Those natural consequences the district court referred to appear to be an "increase [in] vehicular and foot traffic" and "the inevitable noise created when cars and people enter and exit the location." Although there was no attempt by the Planning Commission or the Town Council to measure or quantify those anticipated impacts, it is apparent that each held the view that

because of the proximity of the Proposed Lot to residences, whatever noise or traffic the Proposed Lot would generate would unreasonably interfere with the residents' right to quietly and peaceably enjoy their properties.[12]

¶56    While I have no doubt that a parking lot will generate noise and traffic and therefore have some impact on neighboring properties, I hesitate to equate presumed impacts with substantial evidence. *See Ralph L. Wadsworth Constr., Inc. v. West Jordan City*, 2000 UT App 49, ¶ 17, 999 P.2d 1240 ("[T]he decision to deny an application for a conditional use permit may not be based solely on adverse public comment."); *see also Uintah Mountain RTC, LLC v. Duchesne County*, 2005 UT App 565, ¶ 32, 127 P.3d 1270 (concluding that the denial of a conditional use permit was "impermissibly based solely on adverse public comment" where there was "no record evidence detailing actual safety issues" with the proposed use (quotation simplified)). Absent some attempt to measure those impacts, it is difficult to assess whether those impacts would not just interfere with the right to quietly and peaceably enjoy one's property, but whether they would *unreasonably* interfere.

¶57    But even if the assumptions about generalized impacts inherent in a commercial lot equate to substantial evidence, I cannot agree with the district court's conclusion that there was substantial evidence to support the Appeal Authority's determination that reasonable conditions could not be imposed to mitigate those detrimental effects.

---

12. The majority describes this as evidence, *see supra* ¶ 32, but it is apparent that what it really describes are merely "concerns" and "beliefs" about potential noise and traffic congestion, *see supra* ¶¶ 30–31 (describing "concerns" and "beliefs" about the parking lot's potential to generate noise, odors, and other activities).

¶58    As the majority notes, the district court observed that the record is "less than ideal with respect to details on the mitigation issue." *Supra* ¶ 25. And while the district court expressed concern over that lack of detail, it ultimately concluded that because the town "considered" and "rejected" Staker's proposals for mitigation, there was substantial evidence to support the Appeal Authority's decision. I disagree.

¶59    The Utah Code required that Staker's conditional use permit application be approved "if reasonable conditions are proposed, or can be imposed, to mitigate the reasonably anticipated detrimental effects of the proposed use." Utah Code Ann. § 10-9a-507(2)(a) (LexisNexis 2015). Staker proposed a number of ways to mitigate the anticipated impacts of the Proposed Lot, including limiting the number of parking spaces, installing visual and sound barriers, limiting the hours of operation, and moving the spaces farther away from the closest residence. And while I agree with both the district court and the majority that some of those mitigation proposals were discussed before the Planning Commission and the Town Council, I do not agree that there was substantial evidence to support the Appeal Authority's decision that Staker's proposals could not mitigate the anticipated detrimental effects. I find no discussion or supporting evidence in the record suggesting *why* Staker's proposals were insufficient; I find only articulation of beliefs that they were.

¶60    This court has previously stated that even if the reasons given by a municipality for denying a conditional use permit would be legally sufficient, "the denial of a permit is arbitrary when the reasons are without sufficient factual basis." *See Davis County v. Clearfield City*, 756 P.2d 704, 711 (Utah Ct. App. 1988). Applying that principle here, I see no basis on which to affirm the district court's decision. The concerns and beliefs expressed by the Town Council may have been legally sufficient to justify denying Staker's conditional use permit had the record demonstrated a factual basis for them. But where the Appeal

Authority simply concluded, without evidence, that anticipated but unquantified impacts from the Proposed Lot could not be mitigated, I cannot sustain that conclusion.

¶61　For this reason, I respectfully dissent. Instead of affirming the district court, I would remand the case to the court for it to address the Appeal Authority's conclusion that Staker's conditional use permit application was appropriately denied on the alternative basis that it created a need for essential municipal services that cannot reasonably be met within three months. *See supra* ¶¶ 5, 11 n.4, 21. As the majority notes, the district court did not address this aspect of the Appeal Authority's decision. *Supra* ¶ 43 n.9. The court should address Staker's appeal of that decision in the first instance. *See generally McElhaney v. City of Moab*, 2017 UT 65, ¶¶ 15–26, 423 P.3d 1284 (explaining the benefits of an appellate court reviewing the district court's decision compared to directly reviewing the administrative body's decision); *Siebach v. Brigham Young Univ.*, 2015 UT App 253, ¶ 36, 361 P.3d 130 (stating that even when we could affirm on any legal ground apparent on the record, "we also possess the discretion to conclude that the district court should be afforded the opportunity to rule on the arguments in the first instance").

――――――――