2023 UT App 94

# THE UTAH COURT OF APPEALS

MICHAEL BERMES,
Appellant,
*v.*
SUMMIT COUNTY,
Appellee.

Opinion
No. 20220338-CA
Filed August 24, 2023

Third District Court, Silver Summit Department
The Honorable Richard E. Mrazik
No. 200500508

Eric P. Lee and Matt J. Pugh,
Attorneys for Appellant

Mitchell A. Stephens, Margaret Olson, and Helen E.
Strachan, Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES GREGORY K. ORME and JOHN D. LUTHY concurred.

TENNEY, Judge:

¶1     Michael Bermes owns a lot on a ridgeline that overlooks part of Summit County. In 2015, Bermes received permission from the county to build a large home on his lot. In 2020, Bermes sought permission to build an additional 7,000-square-foot accessory building on the lot. The Summit County Council denied this request and the district court later upheld that denial. Bermes now appeals. For the reasons set forth below, we affirm the district court's decision.

BACKGROUND

¶2      Michael Bermes owns a 6.35-acre, 276,000-square-foot lot in Summit County. Bermes's lot sits atop a ridgeline, it slopes downward "in all directions," and a structure on the lot "has the potential to project into the horizon line" when viewed from nearby roads. Bermes's property is also in the county's hillside stewardship zone.

¶3      The Snyderville Basin Development Code (Snyderville Code) governs construction on lots in Bermes's area. The Snyderville Code's general plan "was developed to ensure that the resort and mountain character of the basin is to be embraced and protected, while suburban development patterns, which erode the unique character of the basin, [are] discouraged and, to the extent possible, prohibited." Snyderville Code § 10-1-1.A. Snyderville Code section 10-4-3 is titled "Critical Lands," and subsection C governs development on ridgelines.

¶4      Under section 10-4-3.C, "[s]tructures located on ridgelines as viewed from" public roads are "prohibited." But there's an exception to this prohibition for lots that preexisted the passage of the Snyderville Code. For these lots, the Snyderville Code allows "a structure to project into the horizon line as viewed from a designated roadway" if the structure meets the "special development standards in subsection [C.1.a] of this section." *Id.* § 10-4-3.C.1. Bermes's lot preexisted the Snyderville Code and is thus subject to the special development standards.

¶5      This case turns on the special development standard set forth in section 10-4-3.C.1.a(3), a provision that we'll refer to as the Site Grading Provision. In the part most relevant here, the Site Grading Provision provides that for "[l]ots greater than five (5) acres," "[s]ite grading shall be minimized" and the "limit of disturbance area shall not exceed twenty thousand (20,000) square feet." *Id.* § 10-4-3.C.1.a(3)(A)(iii).

¶6 In 2015, Bermes requested approval to construct a nearly 15,000-square-foot home on his lot. The proposed disturbance area for his home was 43,805 square feet, which was 23,805 square feet above the 20,000-square-foot limit set forth in the Site Grading Provision. Bermes accordingly applied to the Summit County Board of Adjustment (which was the Summit County body that decided such requests at the time) for a variance from the disturbance limit. The Board of Adjustment approved the variance under Snyderville Code section 10-4-3.C, and Bermes then constructed his home.[1]

¶7 This case and this appeal center on Bermes's subsequent request for permission to build an additional accessory building on his property.[2] Some of Bermes's initial plans for his home had

---

1. In the process of constructing this home, Bermes ended up disturbing an area that was 100,000 square feet more than the approved 43,805 square feet of disturbance, and he did so by placing debris from his basement construction on an unapproved (and undisturbed) area. Upon learning of this, Summit County initiated an enforcement action, after which Bermes removed most of the material that exceeded the scope of the approved disturbance. Bermes then hydroseeded the disturbed area, though most of the native vegetation in the area had been destroyed.

2. In the proceedings below and again on appeal, the parties have often referred to this proposed building as a "barn." In the special exception application that will be discussed shortly, however, Bermes said that his proposed building would be around 7,000 square feet and would "be used for[] car parking, Pickup Truck parking, Boat parking, RV Trailer parking, Dirt Bike storage, Snowmobile storage, ATV storage, Vehicle lift, General storage, Hobby Shop, metal/wood working, Other similar uses TBD, Possible future horse stall, and storage." Given Bermes's wide-

(continued…)

included an additional 2,600-square-foot accessory building on the property. Bermes's final proposal for his home in 2015, however, did not include the proposed accessory building.

¶8    In 2020, Bermes submitted a new plan to build an accessory building on his property. In this proposal, Bermes said that his proposed building would involve an additional 9,781-square-foot disturbance area on his lot.

¶9    In an initial response to Bermes's application for a building permit, a Summit County planner informed Bermes that she was "not anticipating any major issues." But another county planner soon informed Bermes that his "property [was] unable to qualify for any additional structures"—including, in other words, the proposed accessory building—"without an appropriate exception." This county planner informed Bermes that to build the accessory building, Bermes would "need to receive a Special Exception[3] to the disturbance limit" and that Summit County would then "process the . . . Permit accordingly."

¶10    As noted, Bermes's request for a variance in 2015 had been decided by the Board of Adjustment. By the time that Bermes sought leave to build his accessory building in 2020, Summit County's procedures had been changed so that it was now the Summit County Council (the Council) that would have to

_____

ranging description of the intended uses for this proposed building, we think it more correct to refer to it as an "accessory building." While we won't alter the few references to it as a "barn" that we quote from the record or the briefing, we'll otherwise refer to it as an accessory building throughout this opinion.

3. As indicated shortly below, the term "special exception" is not capitalized in the code provision from which it's drawn. While we'll follow suit in this opinion, we'll leave untouched any references from the record where it was capitalized.

approve a special exception. Bermes accordingly submitted a land use application asking for a special exception.

¶11　The section in the Snyderville Code dealing with special exceptions contains a subsection entitled "Criteria for Approval." Snyderville Code § 10-3-7.B. Under this subsection, the Council

> shall not approve a special exception unless the applicant demonstrates that: 1. The special exception is not detrimental to the public health, safety and welfare; 2. The intent of the development code and general plan will be met; . . . 3. The applicant does not reasonably qualify for any other equitable processes provided through the provisions of this title; *and* . . . 4. There are equitable claims or unique circumstances warranting the special exception.

*Id.* § 10-3-7.B(1)–(4) (emphasis added).[4]

¶12　Snyderville Code section 10-3-7.D.2 also states that the Council "shall review" both the special exception application and a "staff report." A Summit County planner prepared a 150-plus page staff report on Bermes's application for leave to build the accessory building. This report included an extensive background section, including a history of the construction on Bermes's property, details on the accessory building construction request,

---

4. As discussed below, we conclude that the emphasized "*and*" in this provision indicates that an applicant must establish that all four of the criteria were satisfied.

　　Of perhaps lesser importance, we note the absence of an Oxford comma in the Snyderville Code's statement of the first criterion. In deference to the apparent choice made on this front by the code's drafters, we'll proceed similarly when quoting or discussing this criterion in this opinion.

public comments that had been received, and photos of Bermes's property.

¶13     This report then set forth an analysis of each of the four special exception criteria set forth in section 10-3-7.B. Of note, the planner concluded that Bermes's application failed to satisfy any of the criteria. On the first criterion (public health, safety and welfare), the county planner concluded that Bermes's accessory building application did "not take into consideration the harmony with the surrounding mountain and resort environment and [did] not protect the scenic qualities of the Snyderville Basin." On the second criterion (intent of the development code and general plan), the county planner concluded that granting a special exception "would not be consistent with the policies and goals of the Snyderville Basin General Plan nor would it be consistent with the intent" of the Snyderville Code.[5] And on the fourth criterion (equitable claims or unique circumstances), the planner concluded that Bermes had "not explained what the equitable claims and unique circumstances [were] in this request," that Bermes's "request [was] not a unique circumstance" and any "uniqueness of the lot is something that [Bermes] was aware of

---

5. With respect to both the first and second criteria, the planner further concluded that Bermes's proposal did not "[p]rotect the environmentally sensitive nature of the land," "[p]romote a community of neighborhoods, where rural open space is interspersed with traditional small town characteristic forms as the dominant patterns of development," or "[e]nsure that individual residential development projects, to the extent reasonable, minimize [their] impact on the desired community balance." (Quoting Snyderville Code § 10-1-1.D.)

when [he] purchased the lot and constructed the home," and that there was accordingly "no evidence of a special circumstance."[6]

¶14 Despite having discussed the special exception criteria from Snyderville Code section 10-3-7 through much of the report, the "Conclusions of Law" section of the report incorrectly referenced the "Zoning Variances" criteria that are found in Snyderville Code section 10-3-6. And the planner then included a recommendation in the report that the Council "conduct a public hearing, review the proposal, and deny the application according to the Findings of Fact and Conclusions of Law as outlined in this Staff Report."

¶15 The Council scheduled a public hearing to consider Bermes's application. Before the meeting occurred, Bermes's counsel submitted a "response to the Staff Report" in which he argued that the 20,000-square-foot limit from the Site Grading Provision applied per project, rather than cumulatively as to a particular lot, and that because his proposed 9,781 square feet of disturbance for this project was less than 20,000 square feet, he did not need a special exception at all.

¶16 In October 2020, the Council held a public hearing to consider Bermes's request. Through counsel, Bermes again argued that the 20,000-square-foot requirement applied only on a per project basis. Beyond that, Bermes argued that his proposed building satisfied each of the four special exception criteria, and individual members of the Council engaged his counsel in discussion (albeit briefly) on the first, second, and fourth criteria. During this discussion, members of the Council and Bermes also

---

6. The staff report also concluded that Bermes's requested exception failed to satisfy the third criterion. But the Council eventually conceded that Bermes had satisfied this criterion and Summit County has not argued otherwise on appeal. That criterion is accordingly not at issue.

noted the Board of Adjustment's 2015 finding that it would create a hardship for Bermes if his request for a special exception for his home was denied. They then discussed whether this would be inconsistent with the assertion from the staff report that Bermes would suffer no hardship if the Council now denied his request for a special exception to build the accessory building. Finally, the Council heard comments from many members of the public, all of whom opposed Bermes's request for permission to build this accessory building. At the close of the meeting, the Council decided to "continue the matter" to allow for "deliberation and [a] possible decision at a later date."

¶17 The Council next addressed Bermes's request at a public hearing that was held in November 2020. There, the Council did not hear any further arguments. Instead, individual council members shared their opinions about the request, after which the Council voted to deny it. At the close of this discussion, the Council noted that its legal counsel would prepare a written decision to comport with the Council's vote.

¶18 In a written decision that was issued in December 2020, the Council concluded that the Site Grading Provision's disturbance area limit applied cumulatively. It then concluded that, because of the disturbance area already associated with Bermes's past construction, Bermes now needed a special exception to build his proposed accessory building. On this front, the Council noted that "[t]his matter came before" it "on a request for a Special Exception" and that Bermes was "requesting a Special Exception." Under the heading "Findings of Fact," the Council did not identify the special exception criteria by the numbers given in Snyderville Code section 10-3-7.B, but it did discuss the substance of each criterion, even employing the particular verbiage used for each criterion that was used in section 10-3-7.B. Under a "Conclusions of Law" heading at the end, however, the decision referred to the criteria for zoning variances that are set

forth in Snyderville Code section 10-3-6, as opposed to the special exception criteria set forth in section 10-3-7.B.[7]

¶19 Bermes filed a timely Petition for Review of the Council's decision in district court, arguing that the decision was both (1) "arbitrary and capricious because it [was] not supported by

---

7. Though not identical, there is much similarity between the criteria for a zoning variance under section 10-3-6.B and the special exception criteria set forth in section 10-3-7.B. Specifically, the variance criteria are:

> 1. Literal enforcement of this title would cause an unreasonable hardship for the applicant that is not necessary to carry out the general purpose of the land use ordinances; 2. There are special circumstances attached to the property that do not generally apply to other properties in the same district; 3. Granting the variance is essential to the enjoyment of a substantial property right possessed by other property in the same zone; 4. The variance will not substantially affect the general plan and will not be contrary to the public interest; and 5. The spirit of the provisions of this title is observed and substantial justice done.

Snyderville Code § 10-3-6.B.1–5. And as already noted, the special exception criteria are:

> 1. The special exception is not detrimental to the public health, safety and welfare; 2. The intent of the development code and general plan will be met; . . . 3. The applicant does not reasonably qualify for any other equitable processes provided through the provisions of this title; and . . . 4. There are equitable claims or unique circumstances warranting the special exception.

*Id.* § 10-3-7.B.1–4.

substantial evidence in the record" and (2) "illegal because it [was] based on incorrect interpretations of the Code and [was] otherwise contrary to law."

¶20    In a ruling issued on June 3, 2021, the district court first concluded that the 20,000-square-foot disturbance limit set forth in the Site Grading Provision is cumulative, not per project. But the court then concluded that the Council's "[d]ecision denying [Bermes's] application for a special exception was illegal" because its conclusions focused on the zoning criteria, rather than the special exception criteria. The court accordingly reversed the decision and remanded with instructions for the Council "to make findings and conclusions as required by Utah law" regarding the criteria set forth in "section 10-3-7."

¶21    After the district court issued this decision, Bermes sent a letter to the Council suggesting that it would "benefit from further discussion regarding a point raised during earlier administrative proceedings but not fully explored until the judicial proceedings: that the disturbance that will be created to build [Bermes's] barn is not governed by the 'site grading' limit . . . but, instead," by disturbance area limits that are articulated in a neighboring provision from the Snyderville Code. According to Bermes, the Site Grading Provision was inapplicable because the proposed accessory building didn't involve an activity that qualified as "site grading" at all.

¶22    On June 30, 2021, the Council met to again discuss Bermes's application. At the outset of the meeting, the county attorney advised the Council that there was "no need for further deliberations, given that [the Council] previously analyzed this matter using the special exception criteria and only its written decision was flawed [in] that it focused on variance criteria." The county attorney expressed her view that the Council had already "considered the four" special exception criteria, even though those criteria "didn't go into the written decision." From this, the

county attorney saw no need "for reargument," agreeing with a member of the Council that their task was to "correct[] the written document based on the conversations and decision [the Council] made previously." In response, Bermes's counsel said that "if the [Council] is inclined to reconsider some of these issues," he was, "of course, happy to address them," but he also stated, "I don't think there is any reason to belabor these points any further." The Council then voted in favor of "a motion directing legal counsel to prepare a written legal decision which comport[ed] with [the] Council's prior deliberations."

¶23 The Council issued a new written decision (the Amended Decision) on August 3, 2021. The Amended Decision included much of the same analysis as the previous decision, but it now changed the Conclusions of Law to correspond with the criteria for a special exception set forth in Snyderville Code section 10-3-7.B. The Amended Decision also incorporated, "by reference, the October 21, 2020[,] and November 4, 2020[,] Summit County Council Minutes as well as the transcripts of both of those meetings."

¶24 Bermes then filed a petition asking the district court to reverse the Council's decision to deny his request for a special exception. There, Bermes argued that the Amended Decision was illegal, primarily because it "lack[ed] any indication of the 'substantive review' required" under Utah law, and that it was also arbitrary and capricious because there was substantial evidence that he successfully met all of the special exception criteria.

¶25 The Council opposed that petition, after which the district court heard oral arguments on it. At the close of those arguments, the district court ruled from the bench that the Amended Decision was neither illegal nor arbitrary and capricious. First, the court ruled that the Amended Decision was legal because the Council had given Bermes's request the level of review required by law.

The court noted that the "record show[ed] lengthy discussions before the Council led by [Bermes's counsel] of the four [criteria] relevant to approval of a special exception under Section 10-3-7" of the Snyderville Code and that the Council's Amended Decision subsequently "reache[d] a conclusion regarding each [criterion]."

¶26   Second, the court ruled that the Amended Decision was not arbitrary or capricious because, after "consider[ing] all evidence in the record, both favorable and contrary to the [Council's] decision," a reasonable mind could find there was substantial evidence supporting the Council's Amended Decision. The court pointed out that the Amended Decision "include[d] 36 findings of fact" and made "a conclusion of law regarding each of those" criteria "from 10-3-7." And it emphasized that if the Council's rejection of "any one of those conclusions [was] supported by substantial evidence," this would be sufficient "to defeat the application for special exception." Examining the record, the court then ruled that a "reasonable mind" could conclude that Bermes had failed to establish the first, second, or fourth criteria, and it pointed to evidence from the record supporting each conclusion.

¶27   The district court subsequently issued a brief written ruling that incorporated and memorialized this decision, after which Bermes timely appealed.

### ISSUES AND STANDARDS OF REVIEW

¶28   Bermes first challenges the district court's conclusion that the Council's denial of his request for a special exception was legal. A land use decision is illegal if it "violates a law, statute, or ordinance in effect at the time the decision was made." *Outfront Media, LLC v. Salt Lake City Corp.*, 2017 UT 74, ¶ 12, 416 P.3d 389 (quotation simplified). We review a lower court's "interpretation of a set of statutes" or "ordinances" for correctness. *Id.*

¶29 Bermes next challenges the district court's conclusion that the Council's decision was not arbitrary or capricious. On this, we "afford no deference" to the district court's decision. *Northern Monticello All. LLC v. San Juan County*, 2023 UT App 18, ¶ 11, 526 P.3d 829 (quotation simplified). Instead, we "apply the statutorily defined standard to determine whether the court correctly determined whether the administrative decision was arbitrary, capricious, or illegal." *Id.* (quotation simplified). "A decision is arbitrary and capricious only if it is not supported by substantial evidence, which is that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *Outfront Media*, 2017 UT 74, ¶ 12 (quotation simplified).

ANALYSIS

¶30 Bermes argues that the Amended Decision was both (I) illegal and (II) arbitrary and capricious. We disagree.

I. Legality

¶31 "A court shall presume that a final land use decision of a land use authority or an appeal authority is valid unless the land use decision" is either "arbitrary and capricious" or "illegal." Utah Code § 17-27a-801(3)(b); *see also Staker v. Town of Springdale*, 2020 UT App 174, ¶ 17, 481 P.3d 1044 ("We will not disturb the decision of a land use authority or an appeal authority unless the decision is arbitrary and capricious or illegal." (quotation simplified)). A land use decision is illegal if it "violates a law, statute, or ordinance in effect at the time the decision was made." *Outfront Media, LLC v. Salt Lake City Corp.*, 2017 UT 74, ¶ 12, 416 P.3d 389 (quotation simplified).

¶32 In Bermes's view, the Amended Decision was illegal because (A) the proposed accessory building did not require "site

grading" as that term is used in the Snyderville Code; (B) even if it did, the Site Granding Provision's disturbance limit should have been measured per project, not cumulatively; and (C) the Council failed "to conduct the substantive review required by Utah Code section 17-27a-508(1)(a)(i)." We disagree on each front.

A.    "Site Grading"

¶33    As noted, the Council applied Snyderville Code section 10-4-3.C.1.a(3)(A)(iii) to Bermes's application for permission to construct an accessory building. As also noted, the Site Grading Provision limits the "disturbance area" that can be caused by "site grading" on a particular lot.

¶34    Bermes argues that while the Site Grading Provision obviously "limits permissible disturbance, it does so for site grading, not barn construction." And we acknowledge at least some potential force to Bermes's position. As Bermes points out, the Site Grading Provision is set off by an initial inline subheading that refers to "Grading Limitations," after which it declares that "[s]ite grading shall be designed to create visual interest by combining terraced retaining walls, landscape pockets with screen plantings, landscaping and variations in the texture and pattern of wall materials." Snyderville Code § 10-4-3.C.1.a(3). Bermes argues that the use of the term "grading" and the nature of the included examples suggest that this is a *landscaping* provision, rather than one that would be applicable to the proposed construction of a barn or accessory building. In Bermes's view, the Council should have instead applied the "very next section of the Code"—Snyderville Code section 10-4-3.C.1.a(4)(A). And as final support for his position, Bermes points to caselaw that states zoning ordinances "restricting property uses should be strictly construed, and provisions permitting property uses should be liberally construed in favor of the property owner." *Patterson v. Utah County Board of Adjustment*, 893 P.2d 602, 606 (Utah Ct. App. 1995).

¶35 But even accounting for these arguments, we ultimately disagree with Bermes's position and instead conclude that the Site Grading Provision was indeed applicable to his proposed project.

¶36 The term "site grading" is not defined in the Snyderville Code. Where a term is "not defined, we assess the ordinary meaning of the term using the dictionary as our starting point." *In re C.N.*, 2023 UT App 41, ¶ 26, 529 P.3d 1030 (quotation simplified).[8] In a construction context like this one, the word "grade" means "to level off to a smooth horizontal or sloping surface."[9] In other words, it refers to "the work of leveling dirt."[10] And while the word "grading" is linked to the word "site" in this provision, the word "site" simply refers to "the spatial location of an actual or planned structure."[11] Thus, taken together, the phrase seems to refer to the act of leveling off (or, instead, creating a

---

8. "Municipal ordinances" like the Snyderville Code "are subject to ordinary rules of statutory interpretation." *Ogden City Plaza Invs. Ltd. v. Ogden City Board of Zoning Adjustment*, 2022 UT App 74, ¶ 7, 514 P.3d 562, *cert. denied*, 525 P.3d 1262 (Utah 2022); *see also Pinetree Assocs. v. Ephraim City*, 2003 UT 6, ¶ 13, 67 P.3d 462 ("We interpret municipal and county ordinances and resolutions according to our well-settled rules of statutory interpretation and construction.").

9. *Grade*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/grading [https://perma.cc/LUR7-5WZD].

10. *Grade*, Cornell University Facilities and Campus Services Facilities Operations Glossary of Construction Terms, https://operations.fs.cornell.edu/info/ir_glossary.cfm [https://perma.cc/NHT7-KG57].

11. *Site*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/site [https://perma.cc/D5K9-4BYT].

particular slope on) the surface of the ground underlying an actual or planned structure.[12]

¶37   So viewed, the act of grading the land in question was a necessary step in Bermes's proposed project. Again, Bermes's property is located on a ridgeline hill that slopes downward "in all directions," and yet Bermes now proposed to build a 7,000-square-foot accessory building on it. To build this structure, he would of course need to first level or smooth the dirt, and he hasn't contended otherwise. Because of this, and based on the plain language alone, this project did indeed seem to require "site grading."

¶38   It's true, as Bermes points out, that there was language within the Site Grading Provision that referred to the inclusion of "terraced retaining walls," "landscape pockets with screen

---

12. Though not dispositive, we note that this phrase has been defined similarly in some other publicly available sources as well. *See, e.g.*, Turner, *What is Site Grading?*, HomeQuestionsAnswered, https://www.homequestionsanswered.com/what-is-site-grading.htm [https://perma.cc/FY3F-742R] (noting that "[s]ite grading is the process of adjusting the slope and elevation of the soil around a home or building" and that "[p]rior to construction or renovation, site grading may be performed to even out the surface and provide a solid foundation"); Westmier Construction, *What Is Site Grading & How Is It Used in Construction?*, Connect2Local, https://connect2local.com/l/338839/c/362163/what-is-site-grading---how-is-it-used-in-construction [https://perma.cc/8XLS-B69N] ("Site grading is a technique used by excavation professionals to adjust the slope of an area prior to building construction."); *A Guide to Grading in Construction*, SafetyCulture, https://safetyculture.com/topics/land-grading/ [https://perma.cc/2A9G-NKEG] ("Grading in construction, typically called site grading, refers to the act of ensuring a level base or getting a specific slope on the land.").

plantings," and "landscaping and variations in the texture and pattern of wall materials." Snyderville Code § 10-4-3.C.1.a(3). But even so, we disagree with Bermes's claim that these landscaping-related references somehow limited the Site Grading Provision to projects that were *confined* to landscaping as opposed to the construction of a building. Instead, we agree with the Council's characterization on appeal that these are best read as "aesthetic requirement[s] that appl[y] when site grading occurs on a lot," rather than as definitional limitations on what the term "site grading" means. Indeed, we note here that the Site Grading Provision itself contains a subsection under which "[s]ite grading shall be minimized and shall not exceed the following limit of disturbance area (including all portions of the *driveway* and *construction activity*)." *Id.* § 10-4-3.C.1.a(3)(A) (emphases added). The terms "driveway" and "construction activity" would not ordinarily be restricted to landscaping-related projects, and yet the Site Grading Provision includes them under its auspices too. Given the use of these non-landscaping terms, and given the more general (and commonly accepted) definitions applicable to the term "site grading," we see no basis for limiting the Site Grading Provision's applicability to landscaping projects.

¶39   This leaves Bermes's argument that the Site Grading Provision doesn't apply and that it's instead the neighboring provision, Snyderville Code section 10-4-3.C.1.a(4)(A), that should govern his application. This neighboring provision has an inline subheading "Landscape Requirements"—which is at least a touch ironic, given that Bermes is arguing that the Site Grading Provision is inapplicable precisely because it is limited to landscaping, not the construction of the accessory building. In any event, this neighboring provision governs the "[r]emoval of and disturbance of existing vegetation," and it "limit[s]" the "disturbance area" to an area "no greater than twenty feet (20')
from the building footprint." *Id.* At oral argument, Bermes claimed that because the Site Grading Provision measures the

allowable disturbance area differently (i.e., it limits the disturbance area to 20,000 square feet), "both can't exist at the same time." But the Council contends otherwise. As the Council explained at oral argument, "it is not inconsistent to say there is a total disturbance area for a lot of five acres and that the total disturbance area is 20,000 square feet or less, and to also say that the disturbance area can only go so far beyond any particular building and that the . . . construction has to occur within that overall disturbance area. Both of those things can be true." We agree with the Council on this point. Like the Council, we see no reason why a project couldn't separately be subject to both limitations. Bermes has therefore failed to persuade us that the existence of this neighboring provision and its differently defined allowable disturbance area is reason to conclude that the Site Grading Provision is inapplicable to his proposed project.[13]

¶40    In short, the natural understanding of the term "site grading" encompasses the very kind of activity that Bermes intends to conduct on his land. Because of this, it was not illegal for the Council to apply the limit from the Site Grading Provision to Bermes's application.

B.    Cumulative Nature of the Disturbance Area

¶41    As noted, the Site Grading Provision limits the "disturbance area" on lots that are the size of Bermes's to "twenty thousand (20,000) square feet." Snyderville Code § 10-4-3.C.1.a(3)(A)(iii). Bermes next argues that, even if the Site Grading Provision is applicable to his proposed accessory building, its limits "would still not apply because [his] proposed [9,781-square-foot] disturbance area is well under" the 20,000-square-foot threshold. In Bermes's view, the disturbance area limit

---

13. We note that the record shows that Summit County considered both the Site Grading Provision and the neighboring provision in other applications for construction in Bermes's subdivision.

should be measured on a per project basis, rather than a cumulative basis. We disagree for two reasons.

¶42     The first is based on the language of the Snyderville Code itself. It's true, as Bermes points out, that the Site Grading Provision does not explicitly state that the disturbance area should be measured cumulatively. But the Site Grading Provision also does not explicitly state that it applies on a per project basis.

¶43     When "evaluating the plain language of a particular statutory provision, we interpret it in harmony with other statutes in the same chapter and related chapters." *Summit Water Distrib. Co. v. Summit County*, 2005 UT 73, ¶ 17, 123 P.3d 437 (quotation simplified); *see also State v. Campbell*, 2012 UT App 75, ¶ 2, 274 P.3d 1021 ("We also follow the cardinal rule that the general purpose, intent or purport of the whole act shall control, and that all the parts be interpreted as subsidiary and harmonious to its manifest object." (quotation simplified)). And though it does not address this question explicitly, we do see some textual cues within the Site Grading Provision that suggest that the disturbance area is to be measured cumulatively. For example, the disturbance area limit is set forth in Snyderville Code section 10-4-3.C.1.a(3)(A). Of note, that subsection contains three different disturbance area limits, each of which turn on the size of the "lot[]" rather than the size of the particular project. *See id.* § 10-4-3.C.1.a(3)(A)(i)–(iii). Moreover, the introduction to this subsection states that a site grading disturbance area "includ[es] *all* portions of the driveway *and* construction activity." *Id.* § 10-4-3.C.1.a(3)(A) (emphasis added). The word "all" is, of course, an inclusive term. And its reference to the disturbance area associated with the "driveway"—without any limitation based on whether the driveway is involved in the particular "construction activity" now at issue—likewise suggests that it's focused on the total disturbance area that has occurred on the lot cumulatively.

¶44    Second, if there's ambiguity about how to interpret a provision, courts may look to the understood purpose of a statute or ordinance. *Alliant Techsystems, Inc. v. Salt Lake Board of Equalization*, 2012 UT 4, ¶ 21, 270 P.3d 441 ("Where the language of a statute is ambiguous, we may look beyond the statute's text in order to ascertain its legislative purpose." (quotation simplified)). Here, the Snyderville Code tells us what its purpose is. It states that "[s]tructures located on ridgelines . . . shall be prohibited," though structures are permitted on lots that preexisted the passage of the Snyderville Code if they comply with "special development standards," Snyderville Code § 10-4-3.C.1. And the Site Grading Provision from those special development standards then states that "[s]ite grading shall be minimized." *Id.* § 10-4-3.C.1.a(3)(A). These are clear indications of an intent to minimize development on this ridgeline. But Bermes's interpretation would in theory allow a lot owner to disturb far more than 20,000 square feet on a lot, just so long as the disturbances don't occur within the same project. This interpretation would facilitate excess development, not "minimize" it, thus enabling the very thing that this provision is designed to prohibit. This would be at odds with the "purpose the statute was meant to achieve." *Summit Water Distrib. Co.*, 2005 UT 73, ¶ 17 (quotation simplified).

¶45    For these reasons, we agree with the Council that the Site Grading Provision's limit on the disturbance area is properly understood as applying cumulatively, rather than on a per project basis. Because of this, we see no illegality in the Council's conclusion that the proposed project violated this provision.

C.    Substantive Review on Remand

¶46    As discussed, the Council initially denied Bermes's request in a decision that applied the zoning variance criteria found in Snyderville Code section 10-3-6, rather than the special exception criteria found in Snyderville Code section 10-3-7. Because of this

error, the district court remanded for reconsideration, after which the Council issued the Amended Decision that correctly applied the special exception criteria. Bermes now argues that when the Council adopted the Amended Decision, it simply "incorporated its pre-remand deliberations," and that by doing so, the Council failed "to conduct the substantive review" of his request as "required by Utah Code section 17-27a-508(1)(a)(i)." From this, Bermes argues that the Amended Decision was illegal. We disagree.

¶47　Utah Code section 17-27a-508(1)(a)(i) provides that "[a]n applicant who has submitted a complete land use application, including the payment of all application fees, is entitled to substantive review of the application under the land use regulations . . . in effect on the date that the application is complete." The statute does not define the term "substantive review," and the parties have pointed to no authority defining it either. Regardless, whatever the precise contours of that requirement actually are, we think the review given by the Council before issuing the Amended Decision was more than sufficient to fulfill its statutory obligation. This is so for several reasons.

¶48　**First, its earlier deliberations.** Although the conclusions of law in the initial decision incorrectly referred to the zoning variance criteria, the record shows that the Council received much information about the special exception criteria before issuing that initial decision. Of particular note, the Council received a staff report that identified each of the special exception criteria by name and then provided detailed analysis of each criterion. On the first criterion, for example, the report argued that Bermes's proposed accessory building was detrimental to the public health, safety and welfare because it would "project into the horizon line" and require disturbance far beyond the 20,000-square-foot limit, which wasn't in harmony "with the surrounding mountain and resort environment" and wouldn't "protect the scenic qualities of

the Snyderville Basin." On the second, the report argued that the proposed accessory building did not meet the intent of the Snyderville Code and general plan because of the same reasons articulated in criterion one, plus the fact that the accessory building wouldn't "[p]rotect the environmentally sensitive nature of the land," wouldn't "[p]romote a community of neighborhoods where rural open space is interspersed with traditional smalltown characteristic forms as the dominant pattern of development," and would negatively impact "the desired community balance." (Quoting Snyderville Code § 10-1-1.D.) And on the fourth, the report argued that Bermes had no equitable claims or unique circumstances warranting the special exception because no neighbor in a similar situation had an accessory building anywhere near the proposed size of Bermes's building and that the "uniqueness of the lot [was] something that [Bermes] was aware of when [he] purchased the lot and constructed [his] home."[14]

¶49 After receiving the staff report, the Council held two meetings at which Bermes's proposal was discussed. During the first meeting, Bermes's counsel presented detailed arguments about why Bermes's application satisfied each of the four special exception criteria. With regard to the first criterion, for example, Bermes's counsel argued that the proposed accessory building was "not detrimental to the public health, safety and welfare." And in making this argument, Bermes's counsel criticized the staff report's conclusion that Bermes did not satisfy this criterion, responding with particularity to several points made in the report about it. In this same meeting, several members of the Council specifically commented on the special exception criteria by name and in substance. At one point, for example, two members of the Council asked Bermes's counsel about arguments he'd made that

---

14. Bermes has not argued that we could (much less should) assume that the council members didn't read the report.

were specific to the first special exception criterion. And at another point, members of the Council asked questions specific to the second criterion. During this same meeting, members of the Council also asked him questions about the history of Bermes's construction on this lot, an issue that arguably related to several of the criteria. During that portion of the discussion, a member of the county attorney's office noted that this was "why" Summit County "come[s] up with these *specialized criteria* and a *special exception* so that if someone has a piece of property that does not otherwise comply with any other provision of the code, [the county] still want[s] them to be able to build a home on it if it's a lot of record," thus directly referencing the special exception by name and concept. (Emphases added.)

¶50 During the second meeting, the Council again deliberated about whether to approve Bermes's proposed accessory building. At the outset of that discussion, one council member discussed the fourth special exception criterion, after which a second council member stated that she "concur[red]" with the first council member and that she "came to the same conclusion."[15]

---

15. When the potential relevance of these discussions came up at oral argument before this court, Bermes's counsel noted that he had done the "talking" about the special exception criteria during the second meeting before the Council and that there "was almost no comment from the council members about [his] argument." Fair enough. But even if it's true that Bermes's counsel did most of the talking about these criteria at that meeting, the ultimate question is whether there's reason to believe that the Council *considered* them. And in answering this question, we have no reason to assume that the council members were ignoring Bermes's counsel as he spoke. Thus, because Bermes's counsel was focused on the correct criteria, it's reasonable to assume that the council members were considering those criteria while

(continued…)

¶51    **Second, the original decision.** As noted, the Conclusions of Law in the original decision incorrectly focused on the zoning criteria. But even so, much of the rest of the decision was correctly focused on the special exception criteria. For example, the decision began by highlighting that "[t]his matter came before the [Council] on a request for a *Special Exception*." (Emphasis added.) And the Findings of Fact likewise stated that Bermes was "requesting a *Special Exception*." (Emphasis added.) Moreover, while the decision did not identify the special exception criteria by number, it did discuss the substance of each criterion, even employing the particular verbiage used in the special exception provisions from the Snyderville Code.

¶52    **Third, the Council's post-remand discussion and ratification.** After the district court remanded to the Council for reconsideration under the correct criteria, the Council met to discuss the matter. At that meeting, the county attorney expressed her view that there was "no need for further deliberations, given that [the Council] previously analyzed this matter using the special exception criteria and only its written decision was flawed [in] that it focused on variance criteria." When she made this point, the council members did not disagree, nor did they express any confusion about any new set of questions that they were now being asked to decide in the first instance. As one member of the Council put it, their task was simply to "correct[] the written document based on the conversations and decision [the Council] made previously." No member of the Council pushed back on this assertion. And Bermes's own counsel seemed to see things similarly, telling the Council that if it was "inclined to *reconsider*

---

listening to him. And this assumption is, again, supported by the facts that (i) certain members of the Council had engaged with Bermes's counsel in some discussion about the special exception criteria at the first meeting, and (ii) certain members of the Council discussed those criteria at the second meeting too.

some of these issues," he would be "happy to address them," but then stating that he saw no "reason to belabor these points *any further*." (Emphases added.)

¶53   Again, the Council was legally obligated to provide a "substantive review" of Bermes's application under the correct and applicable provision. Here, information regarding the special exception criteria was given to the Council before its initial deliberations, those criteria were discussed by Bermes's counsel at those deliberations, the council members engaged with Bermes's counsel and with each other regarding them, the criteria were discussed in substance in the original decision, and, after the remand, the Council agreed that though its initial decision was mistaken in form, its actual decision was in substance focused on the correct criteria. Given all this, we disagree with Bermes's suggestion that the Council's adoption of the Amended Decision was the product of insufficient deliberation. We see no illegality on this front.

## II. Arbitrary or Capricious

¶54   "A court shall presume that a final land use decision of a land use authority or an appeal authority is valid unless the land use decision" is either "arbitrary and capricious" or "illegal." Utah Code § 17-27a-801(3)(b). Bermes argues that even if the Amended Decision was not illegal, it was still arbitrary and capricious because (A) there was not substantial evidence to support its conclusion that the special exception criteria were not satisfied and (B) the Council treated him unfairly. We disagree.[16]

---

16. As noted, we're reviewing the district court's ruling on this issue, and we "afford no deference" to the district court's determination that the Council's decision was not arbitrary or

(continued…)

A.      Substantial Evidence

¶55    "A land use decision is arbitrary and capricious if the land use decision is not supported by substantial evidence in the record." Utah Code § 17-27a-801(3)(c)(i). Bermes advances two arguments relating to the alleged lack of substantial evidence: (1) he claims that the Amended Decision wasn't specific enough to allow for a substantial evidence review and (2) he also claims that there wasn't substantial evidence to support the Council's

---

capricious. *Northern Monticello All. LLC v. San Juan County*, 2023 UT App 18, ¶ 11, 526 P.3d 829 (quotation simplified).

The parties disagree about whether the Amended Decision was legislative or administrative in nature. In some cases, this distinction might matter because it would alter the standard of review for the arbitrary and capricious analysis. "When a municipality makes a land use decision as a function of its legislative powers, . . . such a decision is not arbitrary and capricious so long as the grounds for the decision are reasonably debatable." *Bradley v. Payson City Corp.*, 2003 UT 16, ¶ 10, 70 P.3d 47 (quotation simplified). But "when a land use decision is made as an exercise of administrative or quasi-judicial powers," the decision is not arbitrary and capricious if it is "supported by substantial evidence." *Id.* (quotation simplified). The reasonably debatable standard is "more deferential" than the already "highly deferential" substantial evidence standard. *Id.* ¶¶ 1, 14; *see also Checketts v. Providence City*, 2018 UT App 48, ¶ 19, 420 P.3d 71.

Bermes argues (and the district court agreed) that the Amended Decision was administrative in nature. The Council, on the other hand, suggests that it was legislative in nature. We need not resolve this dispute, however, because we conclude that the Amended Decision was not arbitrary or capricious even under the less deferential substantial evidence standard.

conclusions that he had not satisfied the special exception criteria.[17]

1.      Specificity of the Amended Decision

¶56    It's settled in Utah that "an administrative agency must make findings of fact and conclusions of law that are adequately detailed so as to permit meaningful appellate review." *McElhaney v. City of Moab*, 2017 UT 65, ¶ 35, 423 P.3d 1284 (quotation simplified). And for good reason. "Without sufficiently detailed findings that disclose the steps by which an administrative agency reaches its ultimate factual conclusions, [an appellate court] cannot perform its duty of reviewing the order in accordance with established legal principles and of protecting the parties and the public from arbitrary and capricious administrative action." *Id.* ¶ 36 (quotation simplified). In this sense, the statutory phrase "substantial evidence" functions as something of a "term of art" that "presupposes" that the administrative body will issue "written findings" that are sufficiently specific so as to facilitate appellate review. *Id.* ¶ 41; *see also Northern Monticello All. LLC v. San Juan County*, 2023 UT App 18, ¶ 24, 526 P.3d 829 (holding that

---

17. Bermes makes an additional argument that serves as something of a springboard for his lack of specificity argument. In what's essentially a repackaged version of the argument addressed above, Bermes suggests that the Amended Decision was arbitrary and capricious because it was "not the product of any kind of deliberative process" in which the Council deliberated about the special exception criteria after the district court's remand.

We reject this argument for the same reason that we rejected its progenitor. As indicated above, we think it clear that the Council did indeed deliberate about whether Bermes's application satisfied the special exception criteria. Given this, we see nothing arbitrary or capricious on this front.

because "the land use authority made no written findings . . . this deficiency prevented appropriate appellate review").

¶57 In Bermes's view, the Amended Decision did not adequately disclose the steps that led the Council to reject his application. And in making this argument, Bermes focuses on ways he thinks the Amended Decision could or should have been clearer. But as our supreme court explained when rejecting a similar argument in a past case, "recognizing that the Board could have crafted an order that better explained the Board's reasoning does not translate into a basis for concluding that the Board lacked substantial evidence for its decision." *J.P. Furlong Co. v. Board of Oil, Gas, & Mining*, 2018 UT 22, ¶ 27, 424 P.3d 858. Instead, the relevant question is whether the Council issued "sufficiently detailed findings" that would give the applicant "notice of what it would need to challenge on appeal." *Id.* ¶ 30 (quotation simplified). So long as the explanation given by the administrative body in question is sufficiently detailed to provide the basis for review, the decision will not be overturned for lack of specificity—even if the administrative body "did not walk through" all the arguments made by the applicant "item by item" or "articulate" its precise conclusions "in each individual instance." *Id.* ¶ 27. In other words, "to survive the scrutiny of a reviewing court, a land use authority's legal analysis need not be a shining example of lucidity." *Checketts v. Providence City*, 2018 UT App 48, ¶ 17, 420 P.3d 71.

¶58 Here, after the district court remanded for reconsideration, the Council issued the Amended Decision. At the close of the Amended Decision, the Council included a Conclusions of Law section in which it stated that Bermes had not satisfied three of the special exception criteria. Bermes focuses on the fact that those Conclusions of Law were not set forth in much detail. But they didn't need to be, because the Council had also explained its rationale under the Findings of Fact heading. In that section, the Council made 36 separately numbered findings. These included

findings about the history of the development on Bermes's lot and the history of this application, as well as findings about the Snyderville Code provisions that govern the proposed development. Of note, these also included findings about why the Council believed that Bermes had not satisfied each of the three criteria at issue in this appeal:

- First Criterion (public health, safety and welfare): With respect to the public welfare component of this criterion, the Council found that the proposed accessory building did "not take into consideration the harmony with the surrounding mountain and resort environment and does not protect the scenic qualities of the Snyderville Basin." The Council further found that Bermes's proposed building did not "[p]romote a community of neighborhoods, where rural open space is interspersed with traditional small town characteristic forms as the dominant patterns of development," nor did it "minimize its impact on the desired community balance."

- Second Criterion (intent of the development code and general plan): The Council found that Bermes was "proposing to further develop in an area subject to critical land limitations and design requirements identified in both the General Plan and the [Synderville] Code." The Council found that he had "previously received a variance to increase" the "disturbance by 28,805 sq. ft." when he built his home, and it found that now "[g]ranting a Special Exception of 20,000 additional sq. ft. of disturbance would not be consistent with the policies and goals of the Snyderville Basin General Plan nor would it be consistent with the intent" of the Snyderville Code. On this front, the Council thus found "that the request for additional disturbance area" was "not valid" since the owner had "already capitalized on and over the maximum disturbance allowed."

- Fourth Criterion (equitable claims or unique circumstances): The Council specifically found that Bermes's request was "not a unique circumstance." In the Council's view, this was so because no similarly situated neighbor had an accessory building the size of Bermes's proposed building and the "uniqueness of the lot [was] something that [Bermes] was aware of when [he] purchased the lot and constructed the home."

¶59 Given the Council's findings, we disagree with Bermes's contention that we cannot conduct a substantial evidence review. To the extent that Bermes's argument turns on lack of specificity, we accordingly reject it.

2.    Lack of Evidence

¶60 This leads to the real thrust of Bermes's substantial evidence claim, which is that there was not substantial evidence to support the Council's conclusions that he had not satisfied the various special exception criteria.

¶61 Substantial evidence "must be more than a mere scintilla of evidence, though something less than the weight of the evidence." *Kilgore Cos. v. Utah County Board of Adjustment*, 2019 UT App 20, ¶ 24, 438 P.3d 1025 (quotation simplified). Substantial evidence is "that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *Outfront Media*, 2017 UT 74, ¶ 12 (quotation simplified). When conducting a substantial evidence review, this court does "not weigh the evidence anew or substitute [its] judgment for that of the municipality." *Farley v. Utah County*, 2019 UT App 45, ¶ 22, 440 P.3d 856 (quotation simplified). Rather, we "examine the whole record to determine whether a reasonable mind might accept as adequate the evidence supporting the decision." *J.P. Furlong Co.*, 2018 UT 22, ¶ 23 (quotation simplified); *see also Farley*, 2019 UT App 45, ¶ 22 (noting that when conducting a substantial

evidence review, "we consider all of the evidence in the record" (quotation simplified)). In this sense, the substantial evidence standard is "highly deferential." *Checketts*, 2018 UT App 48, ¶ 19.

¶62 Again, the Snyderville Code stated that the Council "*shall not approve* a special exception *unless* the applicant demonstrates that: 1. The special exception is not detrimental to the public health, safety and welfare; 2. The intent of the development code and general plan will be met; . . . 3. The applicant does not reasonably qualify for any other equitable processes provided through the provisions of this title; *and* . . . 4. There are equitable claims or unique circumstances warranting the special exception." Snyderville Code § 10-3-7.B (emphases added). This provision notably uses the conjunctive "and" to link the four criteria, and this word "is most often considered to create a conjunctive condition." *Paar v. Stubbs*, 2005 UT App 310, ¶ 8, 117 P.3d 1079. The district court read this provision conjunctively, concluding that "if any one of those conclusions is supported by substantial evidence," this would be enough to "defeat the application for a special exception." Bermes notably does not challenge that conclusion on appeal. Because of this, we agree that if substantial evidence supports any of the Council's conclusions, Bermes's application for a special exception must fail.

¶63 The Council concluded that Bermes had not established the first, second, and fourth criteria. Here, because we conclude that there was substantial evidence to support the Council's conclusion that Bermes failed to establish the second criterion, this is enough to affirm the decision.

¶64 As noted, the second criterion required Bermes to demonstrate that a special exception for his proposed accessory building would meet "[t]he intent of the [Snyderville Code] and general plan." *Id.* § 10-3-7.B.2. And as set forth in the Snyderville Code, the general plan "was developed to ensure that the resort and mountain character of the basin is to be embraced and

protected, while suburban development patterns, which erode the unique character of the basin, [are] discouraged and, *to the extent possible, prohibited*." *Id.* § 10-1-1.A (emphasis added). Thus, the goal of the general plan is unmistakably tilted toward limiting development in this protected area.

¶65 But there was nothing limited about Bermes's proposal, and the Council had an obvious basis for recognizing this. Again, by his own account, Bermes sought permission to build a 7,981-square-foot accessory building next to his already-built 15,000-square-foot home. And in the staff report that was provided to the Council—which, again, is properly considered as part of the "whole record" nature of this review, *J.P. Furlong Co.*, 2018 UT 22, ¶ 23 (quotation simplified)—the county planner likewise concluded that Bermes's proposed building did not "meet" the Snyderville Code's "goal" of "[p]rotect[ing] the environmentally sensitive nature of the land" and limiting excess development in this ridgeline area.

¶66 While Bermes obviously disagrees with that conclusion, we again note that in this deferential review, we "do not weigh the evidence anew or substitute our judgment" for that of the municipality. *Farley*, 2019 UT App 45, ¶ 22 (quotation simplified). The general plan was focused on limiting development, so the Council therefore had a sufficient basis for concluding that this particular goal would not be served by adding a large secondary building to a lot that already has an even larger primary residence on it. Given that Bermes was required to prevail on all four of the special exception criteria, this is a sufficient basis to reject his claim.[18]

---

18. In any event, we note that we also see substantial evidence to support the Council's conclusion that the fourth criterion was not

(continued…)

B.      Unfairness

¶67     Finally, Bermes claims that the Amended Decision was arbitrary and capricious because of (1) discrepancies between how his neighbors were treated in past cases and how he was treated here and (2) discrepancies between how he was treated when he applied for a variance in 2015 and how he was treated when applying for this special exception in 2020. We disagree.

¶68     First, Bermes argues that he is being treated differently than his neighbors have been treated in the past. Of note, he claims that the Council "did not apply its cumulative disturbance theory to other lots in the neighborhood." But even accepting this assertion as true, Bermes provides no legal support for his assertion that the Council's failure to enforce this ordinance in past instances means that it cannot enforce it now. To the contrary, it's settled that a municipality's "failure to enforce zoning for a

---

met. That criterion required Bermes to show there were "equitable claims or unique circumstances warranting the special exception." Snyderville Code § 10-3-7.B.4. But evidence before the Council showed that there were only three other accessory buildings (out of 43 total lots in the area) that projected into the horizon line in the way that Bermes's proposed accessory building would. In addition, evidence showed that Bermes's proposed building was nearly five times the size of the largest of these three accessory buildings. There was also no evidence that there were unique "geographic or geologic" features about Bermes's property that distinguished it from other properties within the ridgeline area. And the Council had evidence that Bermes was aware of his lot's topography when he purchased the lot and applied for a variance to build his home, which meant that he was likewise on notice that any proposed construction would be subject to heightened zoning restrictions. All of this together supported the Council's view that Bermes had not satisfied the fourth criterion.

time does not forfeit the power to enforce." *South Weber City v. Cobblestone Resort LLC*, 2022 UT App 63, ¶ 29, 511 P.3d 1207 (quotation simplified); *see also Salt Lake County v. Kartchner*, 552 P.2d 136, 138 (Utah 1976) ("Ordinarily a municipality is not precluded from enforcing its zoning regulations[] when its officers have remained inactive in the face of such violations."). For this reason alone, Bermes has not persuaded us that there was anything arbitrary or capricious about this decision.

¶69   In any event, when Bermes made this same argument below, the Council heard evidence showing that there were differences between the neighboring lots and the construction projects on those lots. This included evidence that Bermes's proposed accessory building would be multiple times larger than any other accessory building on the horizon line. For this reason too, we see no basis for concluding that the Council's decision not to deny the requests in past cases rendered its decision to deny the request in this case arbitrary or capricious.

¶70   Second, Bermes claims that there is an unfair discrepancy between Summit County's decision to approve his request for a variance when building his home in 2015 and its decision to deny his request for a special exception in 2020. But Bermes again provides no authority for his assertion that this difference legally matters, and in our view, it fails under the same authority that we've just cited. Simply put, when Summit County approved his request for a variance in 2015, that didn't mean that it was then obligated to approve any future requests made by Bermes for additional variances or exceptions on his lot.[19]

---

19. The potential negative consequences of accepting Bermes's proposed rule seem obvious. If Bermes's rule were followed, this would in theory disincentivize municipalities from *ever* granting a request for a variance or a special exception, lest the

(continued…)

¶71    In any event, putting the lack-of-authority problem aside, there are several differences between the 2015 and 2020 applications. One difference is a procedural one. In 2015, Bermes's request for a variance ran through the Board of Adjustment; in 2020, his special exception request ran through the Council. Another has to do with the nature of the requests. In 2015, Bermes applied for a variance, but in 2020, he applied for a special exception. While we take the point that there is substantial overlap between the two standards, there is at least some difference, and this too might provide some basis for the differing outcomes.

¶72    But more significantly, there was a pronounced substantive difference between the two requests: Bermes's request in 2015 was for leave to build a home, while his request in 2020 was for leave to build an accessory building. A county attorney highlighted this at the first meeting, stating that the Snyderville Code's special exception provisions exist, in part, "so that if someone has a piece of property that does not otherwise comply with any other provision in" the Snyderville Code, they are still "able to build *a home*." (Emphasis added.) When Bermes countered that "there's no distinction in the [special exception] criteria based on the nature of the structure" that is being built, the county attorney responded that "the analysis of the hardship changes" depending on the type of structure at issue. We agree with the county attorney's sentiment. After all, a lot owner who is prevented from constructing a home on the owner's property would face an entirely different set of problems than a lot owner who has a home but is being prevented from building a separate building for the owner's extra vehicles (or, in the case of a barn, the owner's animals).

---

municipality effectively lose zoning or enforcement power over that lot or other neighboring lots moving forward.

¶73    Finally, Bermes's own history gave the Council at least some additional reason to view his latest request with disfavor. The Board of Adjustment in 2015 approved Bermes's request to disturb 43,805 square feet when building his home. But in the process of building that home, Bermes disturbed an area that was approximately 100,000 square feet beyond the 43,805 that was already approved, and in doing so, "most of the native vegetation was lost." This led to an enforcement action. In light of this history, the Council had at least some reason to be skeptical that Bermes would limit himself to the contours of his own proposal if it now approved his request for a special exception to build an accessory building. This, too, gave the Council some reason to treat Bermes differently in 2020 than the Board of Adjustment had treated him in 2015.

¶74    In short, Bermes has not persuaded us that the Amended Decision was somehow arbitrary or capricious because of any discrepancies between its decision here and the past decisions involving Bermes's neighbors or even himself. This claim accordingly fails.

CONCLUSION

¶75    We see no illegality in the Council's decision to deny Bermes's request for a special exception. First, we conclude that the Snyderville Code's Site Grading Provision applies to Bermes's special exception application because construction of his accessory building requires site grading. Second, we conclude that the provision's disturbance area limit applies cumulatively and that because Bermes had previously exceeded this limit, the Council properly concluded that Bermes needed a special exception to disturb more area. And third, we conclude that the Council's Amended Decision was not illegal because it provided the substantive review required under Utah law.

¶76 We also conclude that the denial was not arbitrary or capricious. The Council's Amended Decision was specific enough to facilitate appellate review, and its determination that Bermes had not satisfied the second criterion was supported by substantial evidence. Finally, Bermes has not persuaded that there was any actionable unfairness based on how Bermes was treated in these proceedings.

¶77 For these reasons, we affirm the district court's ruling.